IN THE MATTER OF MICAH STORM DULA, A MINOR CHILD

No. COA00-391

(Filed 17 April 2001)

**1. Termination of Parental Rights— Permanency Planning order—child placed outside of home for 19 months**

A Permanency Planning order continuing custody of a child with the Caldwell County Department of Social Services was reversed and remanded where the child had been in the custody of DSS and in placement outside the home for 19 months and the court did not direct DSS to initiate termination of parental rights proceedings or make findings as permitted by N.C.G.S. § 7B-907(d)(1-3).

**2. Termination of Parental Rights— efforts to reunite parent and child—findings**

The trial court had no obligation to further attempt to reunite a child in DSS custody with his parent and was obligated to locate permanent placement outside the parent's home where the court found that DSS had made numerous efforts to prevent or eliminate the need for placement outside the home.

Judge TYSON concurring in part and dissenting in part.

Appeal by respondent mother from order filed 10 January 2000 by Judge Jonathan L. Jones in Caldwell County District Court. Heard in the Court of Appeals 30 January 2001.

*Elizabeth M. Spillman for petitioner-appellee.*

*Austen D. Jud for respondent-appellant.*

*No brief filed by attorney advocate.*

**IN RE DULA**

[143 N.C. App. 16 (2001)]

GREENE, Judge.

Davida Elaine Dula (Respondent) appeals a "Permanency Planning Juvenile Review" order filed 10 January 2000 continuing custody of Respondent's child with the Caldwell County Department of Social Services (DSS).

The child was originally removed from Respondent's custody by DSS on 1 May 1998, after an investigation by DSS of a report of alleged child abuse. A non-secure custody order was filed by the trial court on 21 May 1998 placing custody with DSS and that order was continued in effect until the trial on the merits of the alleged abuse. On 23 October 1998, the child was adjudicated by the trial court to be an abused child within the meaning of section 7A-517(1).[1] On that same day, the trial court entered a "Juvenile Disposition Order" continuing custody of the child with DSS and found that "reasonable efforts have been made by [DSS] to prevent or eliminate the need for removal of the child from [Respondent], but removal was necessary to protect the safety and health of the child." The matter was reviewed again on 18 March 1999 and custody remained with DSS. On 12 May 1999, the trial court entered a "Permanency Planning" order directing placement of the child to continue with DSS and indicated the "permanent goal in this case shall be one of reunification [of the child] with the mother." The trial court found that DSS had "exercised reasonable and diligent efforts to prevent the need for removal."

On 10 January 2000, the trial court filed its second "Permanency Planning Juvenile Review" order in response to a hearing held on 1 December 1999. In this order, the trial court found in pertinent part that "[t]here are no relatives of the [child] who are willing and able to provide proper care and supervision of the [child] in a safe home," DSS has "made reasonable efforts to prevent or eliminate the need for placement of the juvenile," and that a return of the child to Respondent "would be an extremely dangerous action." The trial court then ordered custody of the child to remain with DSS, "reunification efforts . . . [to] cease," and a plan of adoption for the child to "be pursued" by DSS.

---

The issues are whether: (I) the 10 January 2000 Permanency Planning order must be reversed because the trial court did not com-

---

1. Repealed by Session Laws 1998-202, s. 5, effective July 1, 1999. See now § 7B-101(1) (1999).

ply with the mandates of N.C. Gen. Stat. § 7B-907(d); and (II) the department of social services is required to continue reasonable efforts to reunite the parent and child after the child has been in a placement outside the home for 15 of the 22 months preceding a section 7B-907 hearing.

I

[1] A trial court is required to conduct a permanency planning hearing in every case where custody of a child has been removed from a parent. N.C.G.S. § 7B-907(a) (1999).[2] This hearing must be conducted "within 12 months after the date of the initial order removing custody." *Id.* The purpose of the hearing is to "develop a plan to achieve a safe, *permanent* home for the juvenile within a reasonable period of time." *Id.* (emphasis added). If the juvenile has been in the custody of a county department of social services and in a placement outside the home for "15 of the most recent 22 months" preceding the section 7B-907 hearing, the trial court is required, unless certain findings are made,[3] to "order the director of the department of social services to initiate a proceeding to terminate the parental rights of the parent." N.C.G.S. § 7B-907(d) (1999).

In this case, at the time of the 1 December 1999 permanency planning hearing, the child had been in the custody of DSS and in placement outside the home for 19 months (1 May 1998 through 1 December 1999) of the most recent 22 months. The trial court, therefore, was required to either direct DSS to initiate termination of parental rights proceedings against Respondent or make findings as permitted by section 7B-907(d)(1-3). The trial court did neither.[4] Accordingly, the 10 January 2000 order must be reversed and remanded for entry of an order consistent with the mandate of section 7B-907(d).

---

2. This statute applies to all abuse, neglect, and dependency review hearings commenced on or after 1 January 1999 and, thus, applies to this case.

3. Findings which will relieve the trial court of its section 7B-907(d) obligation are: "The permanent plan for the juvenile is guardianship or custody with a relative or some other suitable person"; "the filing of a petition for termination of parental rights is not in the best interests of the child"; or "[t]he department of social services has not provided the juvenile's family with such services as the department deems necessary, when reasonable efforts are still required to enable the juvenile's return to a safe home." N.C.G.S. § 7B-907(d)(1-3) (1999).

4. The order of the trial court directing DSS to pursue a plan of adoption is not sufficient compliance with section 7B-907(d).

**IN RE DULA**

[143 N.C. App. 16 (2001)]

## II

**[2]** Respondent argues the 10 January 2000 order must be reversed because the trial court ordered all parent-child reunification efforts cease. This argument must be overruled.

Any order placing or continuing the placement of a child in the custody of the department of social services must include findings that the department of social services "has made reasonable efforts to prevent or eliminate the need for placement of the juvenile." N.C.G.S. § 7B-507(a)(2) (1999). The department of social services can be relieved of this obligation if the trial court enters certain findings of fact consistent with section 7B-507(b). N.C.G.S. § 7B-507 (1999).

The department of social services can also be relieved of the obligation of making reasonable efforts if a child has been in placement outside the home for the period of time and under the conditions referenced in section 7B-907(d). If the department of social services has made unsuccessful reasonable efforts during the 15 months the child has been in placement outside the home, pursuant to section 7B-907(b), the efforts of the department of social services and the courts must be redirected to developing a permanent placement for that child *outside* the home, not parent-child reunification. Indeed, reasonable efforts, by definition, "means the diligent and timely use of permanency planning services by a department of social services to develop and implement a permanent plan for the juvenile," when a court "determines that the juvenile is not to be returned home." N.C.G.S. § 7B-101(18) (1999).

In this case, the trial court made numerous findings in its orders entered prior to 10 January 2000 and in the 10 January 2000 order that DSS had made "reasonable efforts to prevent or eliminate the need for placement of the juvenile" outside the home. Respondent does not assign error to those findings. Thus, the trial court, at the permanency planning hearing on 1 December 1999, had no obligation to further attempt to reunify the parent and child and, indeed, had the obligation to locate permanent placement for the child outside of Respondent's home.

Respondent raises an additional assignment of error which we need not address in light of our resolution of the issues presented. We note, however, there is merit to Respondent's argument the trial court erred in permitting Tamara Hayman to testify with regard to statements made to her by Respondent's aunt, who did not testify,

concerning Respondent's treatment of the child. This testimony constituted inadmissible hearsay, see N.C.G.S. § 8C-1, Rule 802 (1999), and on remand should not be considered by the trial court.

Reversed and remanded.

Judge JOHN concurs.

Judge TYSON concurs in part and dissents in part with separate opinion.

TYSON, Judge, concurring in part, dissenting in part.

I concur with the majority's opinion that the trial court's order ceasing reunification efforts must be reversed. I would remand this matter for further proceedings toward reuniting Micah with his mother, consistent with Micah's best interest, in light of the overriding purpose of the Juvenile Code toward reunification of a child with the natural parent(s). I dissent as to the majority opinion's instructions to the trial court on remand. I agree with the majority's opinion that in making appropriate findings on remand, the trial court may not consider the hearsay testimony of DSS counselor, Tamara Hayman, of conversations with Pam Trivette, Ms. Dula's aunt.

The pertinent facts are as follows. Respondent, Davida Dula, is the single mother of Micah Storm Dula, a minor child born on 3 January 1998, who is the subject of this action. Ms. Dula was eighteen years-old in June 1998 when this action was instituted.

On Saturday, 25 April 1998, during the evening, Ms. Dula took Micah to Valdese General Hospital in Valdese, North Carolina, complaining that Micah was crying continuously. Ms. Dula and Micah remained at the hospital for approximately six and one-half hours while doctors performed blood work and x-rays on Micah. Dr. Stanley Yuan treated and released Micah that evening, prescribing antibiotics and pain medication. Ms. Dula and Micah arrived home after midnight on Sunday, 26 April 1998.

Later that morning, Ms. Dula testified that she changed Micah's diaper at approximately 5:00 a.m. and noticed his right leg was swelling. Ms. Dula placed Micah into the bed with her, and the two slept until approximately 11:15 a.m when Ms. Dula's boyfriend, James Kaylor, returned. Ms. Dula stated that Micah's leg continued to swell since earlier that morning. Ms. Dula wanted to return Micah to

Valdese Hospital, but her family advised her to take Micah to Grace Hospital in Morganton, North Carolina.

Ms. Dula brought Micah to Grace Hospital on Sunday afternoon, 26 April 1998. Micah was suffering from a swollen right leg. Dr. Myron Smith examined Micah at Grace Hospital. Dr. Smith found that Micah's right femur was broken, and placed a cast on the leg.

Ms. Dula informed doctors that she had taken Micah to Valdese Hospital the previous evening. Ms. Dula told Dr. Smith that the x-ray technician at Valdese Hospital was a large man, who had picked Micah up by one arm and one leg and placed him on the x-ray table. Ms. Dula testified that she heard Micah scream while he was in the x-ray room.

While Micah was being treated at Grace Hospital, doctors at Valdese Hospital interpreted the results of Micah's x-rays taken the previous evening, 25 April 1998. The x-rays revealed healing 5th through 7th right rib fractures, with a possible fracture of the left 6th rib. Dr. Yuan, at Valdese Hospital, later stated that if Micah's leg had been broken the previous evening, it would have shown in x-rays and in the examination. Dr. Yuan further stated that he did not detect any swelling in Micah's leg, or that Micah was in any significant pain. Grace Hospital reported the incident to petitioner, Caldwell County Department of Social Services ("DSS").

Ms. Dula was interviewed at Grace Hospital by DSS employee Tamara Hayman, and Jim Bryant, of the Caldwell County Sheriff's Department. Ms. Dula stated that she was Micah's primary caregiver, although she lived with her boyfriend, James Kaylor. Ms. Dula explained the child's rib injuries by stating that Micah sometimes slept in her bed, and that "she may have bumped him or he could have rolled over on a pacifier or bottle."

Mr. Kaylor stated to Hayman and Bryant that he left the house at 9:00 a.m. on Sunday, 26 April 1998, to retrieve his own son. Upon returning home at approximately 11:15 a.m., Mr. Kaylor stated that he also noticed Micah's right leg was swollen and informed Ms. Dula. The two decided to take Micah to the hospital.

On Monday, 27 April 1998, Ms. Dula was further interviewed by Natalie Adams of the Burke County Department of Social Services. Ms. Dula told Ms. Adams that her aunt, Pam Trivette, had babysat Micah on Friday, 24 April 1998. Ms. Dula stated that she did not believe her aunt had harmed Micah. Ms. Dula told Ms. Adams that she

believed the right leg fracture was caused by the rough treatment of Micah by the x-ray technician at Valdese Hospital.

Ms. Dula was again interviewed by Tamara Hayman of Caldwell County DSS on Wednesday, 29 April 1998. She told Ms. Hayman that the only place Micah's leg could have been broken was in the x-ray room at Valdese Hospital. Ms. Dula explained the child's broken ribs by stating that she may have bumped him, or that he could have rolled over on a pacifier or bottle. Ms. Dula's mother, Jewel King, told Ms. Hayman that Pam Trivette, Ms. Dula's aunt, babysat Micah from Thursday, 24 April 1998, to Friday, 25 April 1998.

On 1 May 1998, DSS filed a petition alleging that Micah was an abused and neglected juvenile. DSS obtained non-secure custody of Micah on 1 May 1998. A guardian ad litem and attorney advocate were appointed on 4 May 1998. On 6 May 1998, Ms. Dula consented to DSS' non-secure custody of Micah. A trial on the merits was scheduled for 3 June 1998.

On 28 May 1998, Micah was examined by Dr. Vandana Shashi of Brenner Children's Hospital at Wake Forest University in Winston-Salem, North Carolina. Dr. Shashi's skeletal survey revealed healing bilateral rib fractures of the right lateral 3rd through 6th ribs, and left lateral 7th and 8th ribs. The survey also revealed a healing fracture of the mid shaft of the right femur.

Ms. Dula filed a motion to strike and a motion to dismiss the petition on 28 May 1998. On 3 June 1998, the trial court ordered that the hearing on non-secure custody be continued until 15 July 1998, due to the trial judge's need for recusal. The court further ordered that a hearing on Ms. Dula's motions would proceed on 10 June 1998. The trial court granted Ms. Dula's motions to strike and dismiss on 10 June 1998. The trial court dissolved the non-secure custody order, but orally continued non-secure custody with DSS with Ms. Dula's consent.

On 24 June 1998, DSS filed a second petition alleging that Micah was an abused and neglected juvenile. The trial court ordered that Micah remain in DSS custody on 26 August 1998. A hearing was set for 7 October 1998. Following the hearing, the trial court entered an order on that date adjudicating Micah to be an abused juvenile. On 29 October 1998, the trial court filed a juvenile disposition order in which it held that Micah's removal from Ms. Dula's custody was necessary for his safety and well-being. The trial court incorporated the

IN RE DULA

[143 N.C. App. 16 (2001)]

findings of the guardian ad litem, various disposition reports, and psychological evaluations of Ms. Dula. The trial court made no finding that Ms. Dula had injured Micah.

The trial court ordered that Micah continue to remain in non-secure custody of DSS, but held that the goal of the case would be reunification with the mother, Ms. Dula. In order to achieve the goal, the trial court required Ms. Dula to successfully complete a DSS Family Services Case Plan ("Case Plan") toward reunification. The Case Plan required Ms. Dula to perform such tasks as: (1) being honest and cooperative with DSS and the guardian ad litem, (2) completing a nurturing class program, (3) submitting to a psychological evaluation, (4) maintaining employment, and (5) maintaining a suitable household. The Case Plan also stated that "[s]hould [Ms. Dula] be unable to give an explanation of her son's injuries that is consistent with the medical findings, she should be able to understand how such injuries could occur and ways to insure that such injuries might not occur again."

Following another continuance on 7 January 1999, due to rescheduling of judges, the trial court reviewed the 7 October 1998 disposition order on 17 February 1999. The trial court incorporated into its findings of fact reports from the guardian ad litem, DSS, the hospitals, and Foothills Mental Health facility. The trial court again ordered that the goal of the case be reunification with Ms. Dula. Ms. Dula was ordered to submit to an updated psychological evaluation, including a current parent stress test, and to continue to comply with all requirements of the Case Plan. The trial court scheduled a permanency planning hearing for 12 May 1999.

On 12 May 1999 the court entered a juvenile review order stating that reunification efforts were to continue. The trial court again incorporated the findings of the guardian ad litem and DSS into its order. The trial court ordered that reasonable effort should be made to return Micah to his home within a reasonable period of time. Ms. Dula was ordered to continue to comply with the Case Plan. The trial court scheduled a permanency planning review for 1 September 1999.

The 1 September 1999 hearing was further continued due to rescheduling of judges. The trial court held the second permanency planning hearing on 3 November 1999. During that hearing, the trial court allowed Tamara Hayman to testify that Ms. Dula's aunt, Pam Trivette, had stated that Ms. Dula had assaulted her. Ms. Hayman also

testified that Ms. Trivette told her that Ms. Dula would "sling" Micah at her, and stated that "a baby's bones are tough." Ms. Hayman further testified that Ms. Trivette stated that Ms. Dula had smoked marijuana.

On 1 December 1999, the trial court entered an order ceasing reunification efforts between Ms. Dula and Micah. The order allowed for continued visitation by Ms. Dula, but authorized DSS to pursue a plan for Micah's "relative placement or adoption." The trial court found as fact that when Micah was examined on Saturday, 25 April 1998, the doctors did not find any evidence of swollen joints or extremities, or any evidence of leg discomfort or trauma. The court determined, based on Dr. Yuan's statements, that if Micah's leg had been broken on 25 April 1998, the injury would have shown from the x-rays and examination. The trial court further found that the x-ray technician at Valdese Hospital did not pick up Micah by one leg and one arm, and that the technician did not break Micah's leg. The court determined that Micah had not screamed, nor did he show signs of discomfort during the radiology examination at Valdese Hospital.

The trial court found that Ms. Dula was alone with Micah the following morning, Sunday, 26 April 1998. Ms. Dula's boyfriend, Mr. Kaylor, noticed Micah's swollen leg upon returning home mid-morning Sunday, and suggested they go to the hospital. The trial court found that old rib fractures were discovered during Micah's medical examinations. The court determined that the fractures occurred while Micah was in Ms. Dula's primary care.

The trial court concluded that Ms. Dula failed to comply with the Case Plan because she failed to offer any explanation for Micah's injuries that was consistent with the medical findings. The court determined that "[t]he juvenile's return to his own home would be contrary to his best interest," and that reunification efforts "clearly would be futile and inconsistent with the juvenile's health, safety and need for a safe, permanent home within a reasonable period of time."

## I. Order Ceasing Reunification

Ms. Dula alleges that the trial court abused its discretion by ordering that all reunification efforts between Ms. Dula and Micah cease. The essential intent and aims of the Juvenile Code, and more specifically a permanency planning hearing, "is to reunite the parent(s) and the child, after the child has been taken from the cus-

tody of the parent(s)." *Matter of Shue*, 311 N.C. 586, 596, 319 S.E.2d 567, 573 (1984). G.S. § 7B-100 sets forth the purpose of the Juvenile Code:

> (1) To provide procedures for the hearing of juvenile cases <u>that assure fairness and equity and that protect the constitutional rights of juveniles and parents</u>; (2) To develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family; (3) To provide for services for the protection of juveniles by means <u>that respect both the right to family autonomy</u> and the juveniles' needs for safety, continuity, and permanence; and (4) To provide standards for the removal, when necessary, of juveniles from their homes and <u>for the return of juveniles to their homes consistent with preventing the unnecessary or inappropriate separation of juveniles from their parents</u>.

N.C. Gen. Stat. § 7B-100 (1999) (emphasis supplied). The Juvenile Code, including G.S. § 7B-907, applicable to permanency planning hearings, must be interpreted and construed so as to implement these goals and policies. N.C. Gen. Stat. § 7B-100. I review the record in this case in light of these essential goals.

On three separate occasions and over more than one year, the trial court ordered that the continuing goal of the case be reunification. This goal was also clearly stated by DSS, and numerous counselors and professionals who met with and tested Ms. Dula. However, the trial court, *sua sponte*, and without a recommendation from DSS, ordered that reunification efforts cease in its 1 December 1999 order. The trial court based its conclusion on the finding that Ms. Dula failed to fully comply with the Case Plan because she failed to explain Micah's injuries consistent with the medical findings:

> [Ms. Dula] has offered several explanations none of which are explained by the medical evidence or are consistent with the medical evidence. . . . She has not accepted any responsibility whatsoever for the injuries to this child. . . . <u>She has completed all of the services the Department of Social Services has to put her in a position of being able to care for the child</u>, except she has failed to provide explanation for the child's injuries which would allow for the return of the child <u>if the reasons for the explanations for the child's injuries could be addressed</u>.

(emphasis supplied). In essence, the trial court determined Ms. Dula had complied with all other Case Plan requirements and that Ms. Dula was in a position to care for Micah, but that her failure to explain Micah's injuries to the satisfaction of the court warranted termination of reunification.

I agree that the trial court had the authority to cease reunification efforts pursuant to G.S. § 7B-507(b) if competent evidence supports that decision:

> (b) In any order placing a juvenile in the custody or placement responsibility of a county department of social services, whether an order for continued nonsecure custody, a dispositional order, or a review order, the court may direct that reasonable efforts to eliminate the need for placement of the juvenile shall not be required or shall cease if the court makes written findings of fact that: (1) Such efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time.

N.C. Gen. Stat. § 7B-507(b) (1999). The trial court made the statutory finding that reunification efforts "clearly would be futile and inconsistent with the juvenile's health, safety and need for a safe, permanent home within a reasonable period of time." However, all competent evidence before the trial court did not support this finding, and the trial court's conclusion that reunification efforts should cease.

Significantly, DSS never recommended nor requested that reunification efforts cease. In fact, DSS advised the trial court of Ms. Dula's many improvements in its 3 November 1999 permanency planning report. DSS specifically recognized that "Ms. Dula has worked hard to ensure that she is doing [all Case Plan requirements and court orders] and has made many improvements in these areas since her son was placed in foster care." DSS advised the trial court "that Ms. Dula has complied with all services provided to her as well as maintained housing and employment. She has successfully completed the nurturing class program, she has complied with all testing recommended, she has maintained regular contact with the agency and the foster parents, and with her son." DSS did not recommend that reunification be ceased, but recommended that the case be reviewed after three months, based on its findings.

The trial court never found that Ms. Dula abused Micah. DSS acknowledged in its report to the trial court that while "it is be-

lieved that Ms. Dula did cause the injuries to her son or is aware of who did, this has never been proven and she continues to deny any involvement or knowledge." DSS acknowledged that Ms. Dula had been consistent in explaining Micah's injuries from the beginning of the case: "[t]hese were that for the broken ribs he must have rolled over on a bottle or pacifier. For the leg she blames the x-ray technician at the hospital." Beyond such explanations, Ms. Dula simply testified that she did not know to a certainty how the injuries occurred, but that Ms. Trivette, who often babysat Micah, could have been responsible.

The trial court placed an unfair burden of proof on Ms. Dula. The burden of proving a negative is "almost impossible as a practical matter." *Shue*, 311 N.C. at 595, 319 S.E.2d at 573. DSS found that Ms. Dula's explanation for Micah's injuries was consistent from the beginning of the case, and Ms. Dula testified under oath that she did not know to a certainty how the injuries occurred. The trial court's determination that Ms. Dula failed to accept responsibility for the injuries implies that the trial court would only be satisfied with Ms. Dula's confession to hurting her child.

Moreover, the trial court never found that Ms. Dula had failed to understand how such injuries could occur, and ways to prevent future injuries. The Case Plan requirement, on which the trial court relied, could be fulfilled in one of two ways: "[s]hould Davida be unable to give an explanation of her son's injuries that is consistent with the medical findings, <u>she should be able to understand how such injuries could occur and ways to insure that such injuries might not occur again</u>." (emphasis supplied). Ms. Dula's successful completion of nurturing classes and other extensive DSS training and testing, as well as her consistent visitations with her son, supports a finding that Ms. Dula had, in fact, learned proper methods to care for Micah.

In summary, the trial court ordered that reunification cease: (1) despite finding that Ms. Dula had "completed all of the services the Department of Social Services has to put her in a position of being able to care for the child," (2) despite DSS's recommendation that reunification efforts continue due to Ms. Dula's improvements, (3) despite the absence of any proof or finding that Ms. Dula had ever hurt Micah, and (4) despite the absence of a finding that Ms. Dula had not come to understand how to prevent similar injuries. The evidence does not support the trial court's statutory finding that reunification efforts were "futile." *See* N.C. Gen. Stat. § 7B-507(b) (1999). The trial

court's findings do not support the conclusion that reunification efforts between Ms. Dula and Micah should cease.

The essential purposes in interpreting these statutes, including G.S. § 7B-907(d), applied by the majority, is to assure "fairness and equity" for both juveniles and parents, and to work toward reunification while preventing the inappropriate separation of juveniles from their natural parents. *See* N.C. Gen. Stat. § 7B-100. In light of such purposes, I cannot agree with the majority's opinion that Micah's presence in DSS custody "for 15 of the most recent 22 months" under G.S. § 7B-907(d) mandates the conclusion that all efforts to reunify Micah with Ms. Dula should cease.

Micah had been in DSS custody for almost 18 months prior to the 3 November 1999 hearing, not because of Ms. Dula's inaction, procrastination, or abandonment of Micah, but because of DSS' and the trial court's delays and constant continuances over a period of several months. During this time, Ms. Dula was steadfastly working toward reunification and had completed all DSS Case Plan requirements, and did not miss available opportunities to visit her son. Nearly three years have passed since Micah was taken from his mother. In light of these circumstances, I cannot agree that the majority's result is "fair and equitable," consistent with the express purpose of G.S. § 7B-100, as stated in *Shue, supra*.

In light of the essential aim of the Juvenile Code toward reunification of a child with its parent(s), *see Shue, supra*, G.S. § 7B-100, I would hold that the trial court's error constituted an abuse of discretion. Accordingly, I would reverse the trial court's order ceasing reunification efforts, and remand for further proceedings toward reuniting Micah with his mother, consistent with Micah's best interest, and DSS' consistent recommendations.

## II. Hearsay Testimony

I agree with the majority that, on remand, the trial court may not consider Ms. Hayman's testimony regarding out-of-court statements made by Ms. Dula's aunt, Pam Trivette. The trial court permitted Ms. Hayman to testify at the 3 November 1999 hearing that she had a conversation with Ms. Trivette in a parking lot on 10 August 1998 before the hearing on the second petition. Ms. Trivette was not present in court at this hearing where the testimony was given. Ms. Hayman testified that Ms. Trivette told her that Ms. Dula had assaulted her, and

that Ms. Dula smokes marijuana. Ms. Hayman also testified that Ms. Trivette stated that Ms. Dula repeatedly failed to support Micah's head, and that Ms. Dula would "sling" Micah at her, stating that "she couldn't take it anymore." Ms. Hayman also testified that Ms. Trivette told Hayman that when she cautioned Ms. Dula about her rough treatment of Micah, Ms. Dula responded "that a baby's bones are tough."

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." N.C. Gen. Stat. § 8C-1, Rule 801(c) (1999). These out-of-court statements made by Ms. Trivette were offered solely by DSS to show the truth of Ms. Dula's fitness to care for Micah. These statements were hearsay.

I am cognizant that not every admission of hearsay testimony constitutes reversible error. *See State v. Watts*, —— N.C. App. ——, 539 S.E.2d 37 (2000). I further acknowledge, as DSS argues, that the record contains other evidence of Ms. Dula's temper, as well as marijuana use. DSS performed at least three drug tests on Ms. Dula, all with negative results. However, Ms. Trivette's statements, most notably that Ms. Dula would "sling" Micah at her and state that his bones "are tough," were sufficiently damaging to be prejudicial.

This hearsay testimony is also suspect in light of the sixteen-month time lapse between Ms. Trivette's purported statements on 10 August 1998 and Ms. Hayman's testimony in November 1999. Ms. Hayman was the first DSS counselor to interview Ms. Dula at Grace Hospital. Numerous hearings and interviews had occurred since. Accordingly, I agree with the majority's opinion that the trial court may not consider such evidence when making appropriate findings under G.S. § 7B-907, consistent with G.S. § 7B-100 and *Shue*, on remand.