IN RE I.K.

[227 N.C. App. 264 (2013)]

IN THE MATTER OF I.K.

No. COA12-1053

Filed 21 May 2013

**Child Abuse, Dependency, and Neglect—cessation of reunification efforts—insufficient findings of fact**

> The trial court abused its discretion in a child neglect and dependency case by ceasing reunification efforts and awarding guardianship of a minor child to her foster parents. The evidence and the findings failed to support a conclusion that reunification efforts would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time. The case was remanded for entry of an order containing proper findings and conclusions.

Appeal by respondent-father from order entered 11 June 2012 by Judge Beverly Scarlett in District Court, Orange County. Heard in the Court of Appeals 17 April 2013.

*Northen Blue, LLP, by Carol J. Holcomb and Samantha H. Cabe, for Orange County Department of Social Services, petitioner-appellee.*

*Cranfill Sumner & Hartzog LLP, by Laura E. Dean, for guardian ad litem.*

*Richard Croutharmel for appellant, respondent-father.*

STROUD, Judge.

Respondent-father appeals from the trial court's permanency planning order ceasing reunification efforts and awarding guardianship of I.K. ("Ilka")[1] to her foster parents.

In July 2010, Ilka was living with her mother and six-year old brother, N.K. ("Nick"), in a motel in Hillsborough, North Carolina. The family came to the attention of Orange County Department of Social Services ("OCDSS") after the mother attempted suicide. On 10 September 2010,

---

1. The parties all referred to the minor child by the pseudonym Ilka in their briefs. We will refer to her and the other referenced minor children by pseudonym to protect their identities and for ease of reading.

IN RE I.K.

[227 N.C. App. 264 (2013)]

OCDSS filed a juvenile petition alleging Ilka was a neglected and dependent juvenile. The petition alleged, in part, that: the mother had two older children who were no longer in her care, and one of the older children alleged respondent-father physically and sexually abused him; the mother had a restraining order against respondent-father due to domestic violence, which expired in July 2010; respondent-father has limited financial resources and lacks an appropriate residence for the children; and the mother continues to have unmet mental health needs, housing issues, and financial barriers to parenting her children. On 12 November 2010, the trial court adjudicated Ilka dependent.

On 1 September 2011, the trial court conducted a permanency planning hearing. The trial court found respondent-father had complied with some of the requirements of OCDSS, but he had not provided OCDSS with an alternative plan of care for Ilka should he be hospitalized or otherwise unable to care for her. The trial court established a permanent plan of reunification with respondent-father or guardianship with Ilka's foster parents. The trial court ceased reunification efforts with the mother.

On 3 May 2012, the trial court conducted another permanency planning hearing. OCDSS recommended that reunification efforts with respondent-father continue, though the GAL disagreed and recommended that such efforts cease. By permanency planning order entered on 11 June 2012, the trial court ceased reunification efforts with respondent-father and awarded guardianship of Ilka to her foster parents, but also gave respondent-father unsupervised visitation for four hours per month with Ilka, which could be "increased in the discretion of the guardian." Respondent-father appeals from the permanency planning order.

Respondent-father argues the trial court abused its discretion by ceasing reunification efforts with him and ordering a permanent plan of guardianship with Ilka's foster parents where the trial court lacked the evidence to support its findings and the findings failed to support the conclusions of law. OCDSS argues that before even considering whether reunification efforts should have been ceased, "this Court must look first at whether the trial court correctly ordered that the permanent plan for the juvenile be guardianship with the foster parents." OCDSS contends that if we uphold the award of guardianship as a permanent plan, "then respondent's compliance with OCDSS and court demands becomes irrelevant to whether or not reunification efforts would be futile." Respondent-father counters that OCDSS's argument is circular; we believe it is more properly characterized as backwards, probably

because OCDSS has changed its position in this appeal from its position in the trial court.

On appeal, OCDSS now supports the trial court's decision to cease reunification efforts. At the hearing, OCDSS recommended that reunification efforts continue. In some instances, parties may be judicially estopped from taking inconsistent positions at different points in the same litigation. *See In re Maynard*, 116 N.C. App. 616, 621, 448 S.E.2d 871, 874 (1994) (holding that DSS was estopped to argue that the respondent mother was competent to surrender her children when DSS had previously argued that she was so mentally ill that she could not care for her children), *disc. rev. denied*, 339 N.C. 613, 454 S.E.2d 254 (1995). Further, our Supreme Court has expressly disapproved of a party switching positions without explanation. *State v. Hooper*, 358 N.C. 122, 127, 591 S.E.2d 514, 517 (2004) ("[W]here the same party argues two wholly opposing positions in contemporaneous appeals or switches positions during the course of a single appeal, we believe that party has a responsibility to advise the affected courts and, if asked, to justify its actions. Otherwise, such reversals can frustrate not only the fair disposition of individual cases but also the effective administration of justice. Moreover, failure to notify the court will inevitably diminish judicial confidence in a party's legal arguments. These factors apply with particular force where the party in question is the State, which has the elevated responsibility to seek justice above all other ends."). "[T]he law does not permit parties to swap horses between courts in order to get a better mount . . . ." *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934).

Here, OCDSS did not merely "swap horses" on appeal, but hopped on a new horse and began riding in the opposite direction without warning or explanation. OCDSS fails even to acknowledge that its position has changed. This is of particular concern because the primary goal of the Juvenile Code, which includes DSS's duties, is to seek to protect the best interests of abused, neglected, or dependent children. Our Supreme Court has noted that

> the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody [is] that the best interest of the child is the polar star. The [Juvenile] Code itself reflects this goal in its statement of purpose by requiring that its provisions "be interpreted and construed so as . . . [t]o provide standards . . . for ensuring that the best interests of the juvenile are of paramount consideration by the court." N.C.G.S. § 7B–100 (2011).

*In re M.I.W.*, 365 N.C. 374, 381, 722 S.E.2d 469, 474 (2012) (citation and quotation marks omitted). Sometimes it is in the best interest of the child to be removed permanently from a parent; sometimes the best interest will be served by reunification. At the hearing, OCDSS took the position that continuing efforts toward reunification with respondent-father were in Ilka's best interest.[2] Given OCDSS's statutory duties and its specialized abilities to investigate and assess a child's welfare and situation, and its extensive investigation of this particular case, we must assume that OCDSS based its position upon the evidence and its professional assessment of the case, whether the trial court ultimately agreed with OCDSS's position or not. So we are not sure if OCDSS is still seeking to protect Ilka's best interests by its position in this appeal or if it just wants to win a case. In any event, the GAL did advocate for cessation of reunification efforts at the hearing, and we will address the petitioner's argument.

"The purpose of the permanency planning hearing shall be to develop a plan to achieve a safe, permanent home for the juvenile within a reasonable period of time." N.C. Gen. Stat. § 7B-907(a) (2011).

> At the conclusion of the hearing, if the juvenile is not returned home, the court shall consider the following criteria and make written findings regarding those that are relevant:
>
> (1) Whether it is possible for the juvenile to be returned home immediately or within the next six months, and if not, why it is not in the juvenile's best interests to return home;
>
> (2) Where the juvenile's return home is unlikely within six months, whether legal guardianship or custody with a relative or some other suitable person should be established, and if so, the rights and responsibilities which should remain with the parents;
>
> (3) Where the juvenile's return home is unlikely within six months, whether adoption should be pursued and if so, any barriers to the juvenile's adoption;

---

2. The Permanency Planning Review court report of 3 May 2012 recommends that Ilka's primary plan "be reunification with her father" and states that "[Father] is the biological parent of [Ilka] and is ready, willing, and able to parent his daughter. After thorough investigation the department can come up with no reason for him not to parent his child. It will be sad and painful for [Ilka] to be removed from her foster home but it is not a reason to deny [father] his constitutional right to parent. Though [father] has room for improvement in his parenting skills, it does not rise to the level to prevent reunification."

    (4) Where the juvenile's return home is unlikely within six months, whether the juvenile should remain in the current placement or be placed in another permanent living arrangement and why;

    (5) Whether the county department of social services has since the initial permanency plan hearing made reasonable efforts to implement the permanent plan for the juvenile;

    (6) Any other criteria the court deems necessary.

N.C. Gen. Stat. § 7B-907(b) (2011). The trial court may direct the cessation of reunification efforts if it makes written findings of fact that "[s]uch efforts clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." N.C. Gen. Stat. § 7B-507(b)(1) (2011). "Appellate review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law." *In re E.K.*, 202 N.C. App. 309, 312, 688 S.E.2d 107, 109 (2010) (citation, quotation marks, and brackets omitted).

    Here, the trial court entered findings of fact addressing its areas of concern with regard to respondent-father, including sexual abuse, physical abuse, respondent-father's medical fragility, and respondent-father's ability to financially provide for Ilka. Based on its findings, the trial court determined "it is not possible that the juvenile could be unified with either parent." The trial court also determined "[f]urther efforts to reunify or place the juvenile with . . . Respondent father would be futile or inconsistent with the best interest of the juvenile."

    After careful review of the record, we determine the evidence does not support the trial court's findings and the findings do not support the trial court's conclusions. Specifically, there is no evidence to support the trial court's findings that there is an appreciable risk that respondent father would physically or sexually abuse Ilka. The findings regarding respondent father's health and financial circumstances alone are insufficient to support the trial court's cessation of reunification efforts.

    Based upon its findings regarding respondent-father's use of pornography and Granville County Department of Social Services (GCDSS) substantiating sexual abuse by respondent-father against his stepson, "Johnny," the trial court found "there is an appreciable risk

of inappropriate sexual behavior to [Ilka] should she be placed with Respondent father." We conclude that the evidence does not support this finding.

GCDSS substantiated sexual abuse of Johnny by respondent-father based on statements Johnny made during his child abuse medical evaluation (CME).[3] The CME was conducted based upon a referral by GCDSS to the Duke Child Abuse and Medical Evaluation Clinic and was a comprehensive evaluation including an extensive diagnostic interview, physical examination, and review of Johnny's medical, psychological, and educational history. The CME did *not* conclude that respondent-father sexually abused Johnny. Dr. Keith Hersh, respondent-father's therapist testified that he was "curious about why Social Services substantiated sexual abuse by [respondent-father], when the people from the CME chose not to." Dr. Hersh proceeded to testify as follows:

> And I'm curious because it seems, from my reading of the addendum, that the information from the CME was the basis for Social Services substantiating against him. They don't seem to, at least, provide other evidence that he sexually abused any child. So I'm – I'm puzzled that the professionals who conducted the CME chose not to. I mean, clearly, they chose not to when they were willing to substantiate sexual abuse against someone else. Their willingness to substantiate physical abuse by him, but they made the decision not to substantiate sexual abuse by him. And that puzzles me.

Moreover, Dr. Hersh testified that he was not concerned about respondent-father sexually abusing a child. He testified that respondent-father had been "thoroughly evaluated for those issues," and they have "consistently" shown no concern.

In addition, the trial court made no findings about whether respondent-father had sexually abused Johnny. Its findings were at best recitations of evidence of reports which had been made at various times

---

3. No report from Granville County DSS was in evidence. The only evidence of Granville County's substantiation was an addendum to OCDSS's permanency planning review reporting that the OCDSS Social Worker Mitchell called the Granville County Investigative Social Worker to check on the case and she was advised that "the agency made a team decision on May 2, 2012" substantiating sexual abuse as to mother and respondent-father. According to the phone call, this decision was based only "on [Johnny's] statements to the CME evaluator," noting several quotes from Johnny in the CME report. However, the CME report itself does *not* conclude that Johnny was sexually abused by respondent-father; it concludes that he was probably sexually abused by his mother.

IN RE I.K.

[227 N.C. App. 264 (2013)]

to various people, without ever finding any of them to be credible. Recitations of evidence are not findings of fact. *See In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 854 (2004).

Neither Johnny nor anyone who evaluated Johnny regarding the alleged sexual abuse testified in this case. The trial court only found that Granville County DSS had substantiated the claim based upon the CME, even though the CME had not. All of the evidence regarding Johnny's reports of sexual abuse showed that Johnny suffered from substantial psychological problems and was clearly a victim of abuse by someone, although probably not respondent-father. In addition, the trial court also granted respondent-father unsupervised visitation with Ilka for four hours per month. Respondent argues, and we agree, that allowing "unsupervised contact with Ilka is irreconcilably inconsistent with its finding that Respondent would exhibit inappropriate sexual behavior around Ilka if she were reunited with him." It appears that the trial court attempted to use the old allegations of abuse against Johnny, which it appears not to have believed, to support its order for cessation of reunification efforts, while still allowing respondent-father unsupervised visitation.

As to respondent-father's use of pornography, a 2011 Parental Competency Evaluation referred to his use of pornography as an "addiction," though Dr. Hersh testified that he believed respondent-father was never actually addicted to pornography and, in any event, no longer used pornography. The trial court made findings about what the evaluation and Dr. Hersh said about this issue, but did not find that respondent-father was addicted to pornography, that he continued to use pornography, or that such use, if any, negatively impacts his children.

There was no evidence that respondent-father had ever acted inappropriately with Ilka in any way, and certainly no evidence of any sexual misconduct toward her. Respondent-father had been in court-ordered therapy and had taken a battery of tests to evaluate the likelihood that he would sexually abuse a child. None of the tests and none of the professionals who had examined him indicated such a likelihood. No other evidence was presented that supports the trial court's finding that there is "an appreciable risk of inappropriate sexual behavior to [Ilka]."

The trial court next addressed respondent-father's physical abuse of Johnny using a bullwhip, again an isolated event which occurred in 2009, three years prior to the hearing. Unlike the allegations of sexual abuse, respondent-father acknowledged that he had disciplined Johnny with a bull whip because "he was troubled and was always in

therapy and he and [mother] did not know how to handle [him]." The trial court found:

> Whether Respondent father hit [Johnny] intentionally or unintentionally, this court finds that using a bull whip as a method of discipline is physically abusive and such form of discipline puts [Ilka] at risk of harm if placed in Respondent father's home. There is a reasonable probability that this is the method of discipline that Respondent father would employ in the future. There is no evidence before the court for this court to find otherwise.

Although the evidence clearly indicates respondent-father used a bullwhip as a method of disciplining Johnny, a teenage boy, we can discern no evidence in the record to support the trial court's conclusion that there is a reasonable probability the method of discipline would be used on Ilka. Again, just as with the claims of sexual abuse of Johnny, it seems irrational that OCDSS has no objection to and the trial court ordered unsupervised visitation between father and Ilka if they believed that there was any reasonable probability that he would be physically abusive to her.

The evidence showed and the trial court found that respondent-father has attended all treatment, parenting classes, and mental health assessments ordered by the court. He has regularly visited with his children. He attended one parenting class specifically to learn appropriate discipline techniques. The record evidence shows that although respondent-father still has "room for improvement" and still needs guidance, he has no problems with anger or impulse control. The areas noted by OCDSS in which he "needed improvement" were that "he does not like to see [Ilka] get upset;" he let her watch cartoons too long at times and "liked to indulge [Ilka] in sweets;" and once Ilka wanted to go outside to play on a cold, rainy day without shoes, whereupon the social worker asked respondent-father "to stop her and put her socks and shoes on." These are very common parenting issues and do not even hint at inappropriate discipline or abuse.

All of respondent-father's many visitation sessions were reported to have gone smoothly and the supervising social workers reported that respondent-father was patient and properly played with Ilka during their visits. The evidence with regard to respondent-father's appreciation of his past conduct was that he now recognizes using a bullwhip is not an appropriate form of discipline. There was no evidence that respondent-father has failed to learn how to properly discipline his child, that

he had otherwise failed to learn the lessons taught through the parenting classes, or that further classes and guidance would not continue to improve his parenting skills. Indeed, neither the GAL nor OCDSS expressed any safety concerns with regard to respondent-father.[4]

The trial court next addressed respondent-father's medical condition, finding he had suffered "numerous potentially life-threatening illnesses, yet has managed to survive, against all odds." The trial court did not make any findings indicating respondent-father's current medical condition precluded him from reunification with Ilka. The only evidence concerning that issue was the opinion of respondent-father's physicians that his medical conditions do not impede his ability to care for his children. At the hearing, neither OCDSS nor the GAL contended that respondent-father was unable to care for Ilka because of his medical condition.

The trial court's remaining concern was respondent-father's financial ability to provide for Ilka. The trial court found:

> 25. Respondent father receives disability which is his only income. He testified that he was unable to pay a nominal fee to a visitation center in order to have supervised visits with his son [Nick].

> 26. Respondent father further testified that he and his significant other and her two children live on a budget that minimally meets their needs. Respondent father does not think that introducing [Ilka] into the home would create a financial hardship and that her needs could be met on the budget that now barely meets the needs of the current household of two adults and two teenagers.

> 27. Respondent father does not appear to have a realistic view of the financial responsibility of caring for [Ilka].

---

4. The only reference to the issue of abuse in the GAL's report is speculation about what the GAL describes as "an attempt to tell [Ilka's] story. . . . Telling [her] story requires reflecting on the people and events she had experienced in her short life . . . . [Ilka] didn't have a healthy relationship with either parent. In [her mother's] care, she shared a bed with her mother and [respondent-father], and later, Junior. What intimacies did she observe? What did it mean to her that when Junior left, another man came in the door? By all accounts, [respondent-father] spent time with her — in bed, playing violent-themed video games or watching movies with sexual content. What did those experiences mean to her? Did [Ilka] observe [Johnny's] being abused with a bull whip, or smashing a window in winter because he was being punished, and it was cold outside, as he reports?" These are interesting speculations, but there is no evidence that Ilka actually observed the bull whip incident, which occurred when she was no more than a year old.

28. Respondent Father entered into his current relationship during the course of this case. He resided with his significant other for less than one year. At the September 1, 2011 hearing, SW Juanita Hill testified that Respondent Father lived with his mother and has never lived on his own. At the September 1, 2011 hearing, Respondent Father testified that it was financially impossible for him to get housing. Respondent Father moved into the residence of his significant other since September 1, 2011. This court has not received any evidence that Respondent Father has the ability to financially provide for himself and his daughter independent of his significant other.

Respondent-father testified that he could not afford the visitation fee at the center in Raleigh, but would be able to afford to visit Nick in Pittsboro, though it would be a financial strain.[5] When asked how he would afford to care for Ilka, respondent-father testified that he and his partner had "thoroughly discussed and tried to plan and prepare for anything that – that may happen." Respondent-father testified that all of the household expenses were covered, there was food in the house, and Ilka would benefit from what was already being provided in the home. Again, neither OCDSS nor the GAL disputed father's representation of his financial situation.

But even if respondent-father's financial situation is meager, this fact alone would not support cessation of reunification under the facts of this case. Although there were valid concerns regarding Ilka's safety which led to her adjudication as dependent, respondent-father did everything he was asked to do to improve his circumstances and ability to care for her, based upon the trial court's findings. In this regard, this case is similar to *In re Eckard*, 148 N.C. App. 541, 559 S.E.2d 233, *disc. rev. denied*, 356 N.C. 163, 568 S.E.2d 192 (2002). In *Eckard*, we held that the evidence was insufficient to support the trial court's findings in a permanency planning order where

> (1) the injuries to [the juvenile] occurred while she was in the custody and care of another; (2) respondent mother terminated her relationship with the other person and has established and maintained her own dwelling; (3) despite respondent mother's low I.Q., she has no severe mental

---

5. The permanency planning order at issue here only concerned Ilka, not Nick, who had been placed separately. The present appeal only concerns the order as to Ilka. As a result, we do not address any of the evidence regarding Nick.

health issues that would interfere with her ability to parent; (4) respondent mother understands that her poor choices led to the abuse of the child and that the solution is to proceed more slowly before advancing to a live-in relationship; (5) respondent mother has grown and matured to a level as to not be a danger to Patricia; (6) respondent mother continues to remain employed, pay child support, and visit her child regularly; (7) respondent mother has done everything requested by DSS, is following her case plan, and is exceeding minimal standards of care; (8) respondent mother accepts responsibility on her own part for not protecting [the juvenile]; and (9) DSS recommends that the permanent plan for [the juvenile] be reunification with respondent mother.

*Eckard*, 148 N.C. App. at 545, 559 S.E.2d at 235.

This case also resembles *Eckard* in that the trial court considered the benefits of the foster parents before determining that the biological parent would be unable to parent the child:

[t]he trial court's findings and conclusions were based solely on the report submitted by the Guardian ad Litem and testimony by the foster parents that they had established a close relationship with Patricia, that she calls them "momma" and "daddy," and that they expected to adopt Patricia despite the stated goal of reunification with her natural mother. The uncontradicted testimony and evidence from the court-ordered psychologist, DSS referred psychologist, DSS nurturing program coordinator, DSS social worker, and respondent mother does not support the findings and conclusions of the trial court.

*Id.* at 545-46, 559 S.E.2d at 235-36.

Although the trial court made findings of fact addressing its areas of concern regarding respondent-father, we conclude the evidence and the findings fail to support a conclusion that reunification efforts "clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *See In re T.R.M.*, 208 N.C. App. 160, 162, 702 S.E.2d 108, 109-10 (2010) ("A trial court may order the cessation of reunification efforts when it finds facts based upon credible evidence presented at the hearing that support its conclusion of law to cease reunification efforts." (citation and quotation marks omitted)).

**IN RE I.K.**

[227 N.C. App. 264 (2013)]

Furthermore, the trial court found that Ilka could not be unified with respondent-father under N.C. Gen. Stat. § 7B-907(b); the trial court's findings fail to explain, however, why Ilka could not be returned home immediately or within the next six months, and why it is not in her best interests to return home. *See In re Everett*, 161 N.C. App. 475, 480, 588 S.E.2d 579, 583 (2003) (when a child is not returned home, section 7B-907(b)(1) requires the court to find whether it is possible to return a child to her home immediately or within the next six months, and if not possible, the court must explain why.). The trial court made no findings that respondent-father has failed to progress according to the reunification plan, that he has refused to do what the court required of him, or that his current housing situation would be harmful to Ilka. *Cf. In re R.A.H.*, 182 N.C. App. 52, 58, 641 S.E.2d 404, 408 (2007) (holding that an order ceasing reunification efforts and awarding foster parents guardianship was supported where the child was being harmed by the lack of permanency, the mother had not made progress toward reunification despite reasonable efforts from DSS, and the mother had failed to remedy the risks associated with returning the child to her home).

Although the trial court's findings that Ilka was doing well in her current placement and that her guardians are good parents were clearly supported by the evidence, there was no evidence to support the court's findings crucial to its decision to cease reunification efforts under N.C. Gen. Stat. § 7B-507(b) and to support its permanent plan under N.C. Gen. Stat. § 7B-907(b).[6]

---

6. OCDSS argues that if the trial court's best interest determination as to guardianship is supported by the evidence, we need not consider whether reunification efforts would be futile because of N.C. Gen. Stat. § 7B-600(b) (2011). Although we have held that a court may order the cessation of reunification efforts if it makes sufficient findings under N.C. Gen. Stat. § 7B-907(d), the court must still make the findings required by N.C. Gen. Stat. § 7B-907(b). *See In re Dula*, 143 N.C. App. 16, 19, 544 S.E.2d 591, 593 ("The department of social services can also be relieved of the obligation of making reasonable efforts if a child has been in placement outside the home for the period of time and under the conditions referenced in section 7B–907(d)."), *aff'd*, 354 N.C. 356, 554 S.E.2d 336 (2001); *In re M.R.D.C.*, 166 N.C. App. 693, 702, 603 S.E.2d 890, 895 (2004) (holding that "without a valid permanency planning order, the trial court was necessarily unable to make a valid G.S. § 7B–907(d)(1) finding regarding the nature of the permanent plan." (emphasis omitted)), *disc. rev. denied*, 359 N.C. 321, 611 S.E.2d 413 (2005). Therefore, we are unconvinced by the argument that we need only look to whether the court properly concluded that guardianship is in the child's best interest without considering the adequacy of the court's findings under §§ 7B-507 and 7B-907. Although such a system might make judicial review simpler, that is not the law as established by our legislature, nor would it take into account the constitutionally protected interests of a natural parent.

JOHNSON v. FORSYTH CNTY.

[227 N.C. App. 276 (2013)]

Accordingly, we reverse the trial court's order and remand for entry of an order containing proper findings and conclusions. "Whether on remand for additional findings a trial court receives new evidence or relies on previous evidence submitted is a matter within the discretion of the trial court." *In re J.M.D.*, 210 N.C. App. 420, 428, 708 S.E.2d 167, 173 (2011) (citation and quotation marks omitted).

REVERSED and REMANDED.

Judges HUNTER, JR., Robert N. and DILLON concur.