**IN RE E.G.M.**

[230 N.C. App. 196 (2013)]

IN THE MATTER OF E.G.M.

No: COA13-584

Filed 5 November 2013

1. **Native Americans—child neglect proceeding—Indian Child Welfare Act**

    The Indian Child Welfare Act (ICWA) was applicable to a child neglect proceeding where the district court transferred legal custody of the child to the Department of Social Services. The ICWA applies to all state court child custody proceedings involving Indian children. This proceeding qualified as a "foster care placement" and thus a "child custody proceeding" under the ICWA.

2. **Jurisdiction—subject matter—Native American child—neglect—agreement with tribe—record insufficient**

    The question of the district court's jurisdiction under the Indian Child Welfare Act (ICWA) in a child neglect proceeding could not be resolved on the record presented and the matter was remanded for a determination of subject matter jurisdiction. While the State may exercise subject matter jurisdiction pursuant to an agreement with the Eastern Band of the Cherokee Indian Tribe, and a Memorandum of Agreement between the Tribe and the State was tendered, the document was not authenticated and the trial record contained no reference to it.

3. **Native Americans—placement of child in foster care—supporting testimony—prior hearing**

    The trial court's placement of a child in foster care under the Indian Child Welfare Act must be supported by evidence, including expert testimony, introduced at the proceeding that results in the foster care placement.

4. **Native Americans—neglected child—foster care—supporting testimony—not sufficient**

    The removal to foster care of an allegedly neglected child who was a member of the Eastern Band of the Cherokee Indian tribe was not supported by the expert testimony where the court relied upon the testimony of a case manager for Cherokee Family Support Services from a prior hearing. The pediatric psychologist who testified as an expert at the foster care hearing offered no opinion regarding the likelihood of serious physical or emotional damage to the

child in respondent mother's custody and did not profess any expertise in matters of Cherokee tribal culture or childrearing practices.

5. **Appeal and Error—interlocutory orders and appeals—child custody—changed from mother to DSS—immediately appealable**

A permanency planning order that changed legal custody of a child from respondent mother to DSS was immediately appealable.

6. **Native Americans—child neglect—foster case—cessation of reunification efforts—findings**

The authority of North Carolina's district courts to cease family reunification efforts under N.C.G.S. § 7B-507(b)(1) does not conflict with "minimum Federal standards" for Indian child welfare cases established by the Indian Child Welfare Act. The Act merely requires a finding, both before ordering a foster care placement and before terminating parental rights, that "active efforts" to prevent the disruption of the Indian family "proved unsuccessful." The policy concerns that animate the ICWA do not oblige our social service agencies to undertake actions inconsistent with the welfare of Indian children.

7. **Appeal and Error—findings—not made by trial court—evidence in the record**

An order in a child neglect case, involving the Indian Child Welfare Act, that ceased reunification efforts was reversed and remanded for proper findings. While there may be evidence in the record to support a determination that further efforts would be futile, it was up to the trial court to make proper factual findings based on the record evidence.

Appeal by respondent-mother and respondent-father from order entered 18 February 2013 by Judge Donna Forga in Jackson County District Court. Heard in the Court of Appeals 8 October 2013.

*Mary G. Holliday, agency attorney for petitioner-appellee Jackson County Department of Social Services.*

*Angela Lewis, counsel for petitioner-appellee The Eastern Band of Cherokee Indians.*

*Administrative Office of the Courts, by Associate Counsel Deana K. Fleming, for guardian ad litem.*

**IN RE E.G.M.**

[230 N.C. App. 196 (2013)]

*Assistant Appellate Defender Joyce L. Terres for respondent-appellant father.*

*Richard Croutharmel for respondent-appellant mother.*

BRYANT, Judge.

Where the record does not contain sufficient findings of fact and conclusions of law to confirm subject matter jurisdiction under the Indian Child Welfare Act, we vacate the trial court order and remand for entry of findings as to subject matter jurisdiction.

## I. Procedural History

In November 2011, Jackson County Department of Social Services ("DSS") filed petitions alleging that three-year-old E.G.M. ("Ellen") was a neglected juvenile and her four-year-old half-sister, "Nancy," was neglected and abused.[1] The petitions arose from reports of abusive injuries inflicted on Nancy by respondent-father in Ellen's presence. DSS served notice that Ellen was subject to the Indian Child Welfare Act of 1978 ("ICWA" or "Act") as an eligible member of the Eastern Band of the Cherokee Indian Tribe ("the Tribe"). 25 U.S.C. §§ 1901-63 (2012). The Tribe intervened in the proceedings pursuant to 25 U.S.C. § 1911(c) (2012) ("In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding.").

On 16 March 2012, the district court adjudicated Ellen a neglected juvenile. It entered adjudications of abuse and neglect as to Nancy and ordered respondent-father to be placed on the responsible individuals list. *See* N.C. Gen. Stat. §§ 7B-101(18a), 7B-311(b)(2) (2011). In its subsequent "Order on Disposition" entered 10 May 2012, the court awarded legal custody of Ellen to respondents and continued her placement in kinship care with respondent-mother, who had moved out of the marital residence after the petitions were filed. In a 90-day review order entered 15 November 2012, the court found that respondent-mother had been "awarded custody of [Ellen] through a divorce action in the Cherokee Tribal Court."[2] The district court ordered that legal custody would

---

1. Pseudonyms have been used to protect the identities of the juveniles.

2. Respondent-mother is the mother of Ellen. Nancy's mother did not appeal and is not a respondent in this matter. Respondent-father is the father of both Ellen and Nancy.

remain with respondent-mother on the condition that Ellen continue in her kinship placement with family friend J.F.

Following a hearing on 7 January 2013, the court entered the instant permanency planning and review order on 18 February 2013. The order granted legal custody of Ellen to DSS and ordered her continued placement in the home of J.F. The court established a permanent plan of reunification with respondent-mother but relieved DSS of further efforts toward reunification with respondent-father. Both respondents filed notice of appeal from the 18 February 2013 permanency planning order.[3]

## II. Applicability of the ICWA

[1] Congress enacted the ICWA pursuant to its "plenary power over Indian affairs" under U.S. Const. art. I, § 8, cl. 3. See 25 U.S.C. §1901(1) (2012); *see also Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192, 104 L. Ed. 2d 209, 237 (1989) ("[T]he central function of the Indian Commerce Clause is to provide Congress with plenary power to legislate in the field of Indian affairs[.]"). The purpose of the ICWA was "the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture[.]" 25 U.S.C. § 1902 (2012). Accordingly, where the Act provides a higher standard of protection to the Indian family than is otherwise provided by state law, the ICWA standard prevails. *See, e.g., In re Welfare of Child of R.S.*, 805 N.W.2d 44, 49 (Minn. 2011) (citing U.S. Const. art. VI, § 2); *T.F. v. Dep't of Health & Soc. Servs.*, 26 P.3d 1089, 1098 (Alaska 2001); *Quinn v. Walters*, 881 P.2d 795, 809-10 (Or. 1994). Where applicable state law "provides a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under [the ICWA]," the state law prevails. 25 U.S.C. § 1921 (2012).

The ICWA applies to all "state-court child custody proceedings involving Indian children[.]" *Adoptive Couple v. Baby Girl*, 570 U.S. __, __, 186 L. Ed. 2d 729, 733 (2013) (Thomas, J., concurring). The Act defines "child custody proceeding" to include any "foster care placement[.]" 25 U.S.C. § 1903(1)(i) (2012). For purposes of the ICWA, "foster care placement" refers to "any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated[.]" *Id.* Inasmuch as the

---

3. This order addresses only Ellen and the respondent-parents in this action.

district court transferred legal custody of Ellen to DSS, leaving respondent-mother unable to demand her return from kinship care, the proceeding qualifies as a "foster care placement" and thus, a "child custody proceeding" under the ICWA.

Because Ellen is an Indian child, the parties agree that the ICWA applies.

### III. Subject Matter Jurisdiction under the ICWA

[2] Respondents each challenge the district court's exercise of subject matter jurisdiction as contrary to the provisions of the ICWA. "The issue of subject matter jurisdiction may be considered by the court at any time, and may be raised for the first time on appeal." *In re T.B.*, 177 N.C. App. 790, 791, 629 S.E.2d 895, 896-97 (2006). Whether the district court had subject matter jurisdiction is a question of law subject to *de novo* review. *Powers v. Wagner*, 213 N.C. App. 353, 357, 716 S.E.2d 354, 357 (2011). Although the court found that the ICWA "does apply to this matter" and asserted subject matter jurisdiction pursuant to N.C. Gen. Stat. § 7B-200 (2011), it made no findings or conclusions regarding its exercise of jurisdiction under the ICWA.

The ICWA allocates jurisdiction between tribal and state courts as follows:

> (a)  . . . An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law. . . .
>
> (b)  . . . In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, That such transfer shall be subject to declination by the tribal court of such tribe.
>
> (c)  . . . In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the

Indian child's tribe shall have a right to intervene at any point in the proceeding.

25 U.S.C. § 1911 (2012); *cf. also Jackson Cnty. v. Swayney*, 319 N.C. 52, 63, 352 S.E.2d 413, 419 (1987) ("[O]ur State courts lack subject matter jurisdiction to determine paternity in [a] case where the child, mother and defendant are members of the Eastern Band of Cherokee Indians residing on the reservation.").

For purposes of the ICWA, Ellen's domicile was that of her parents. *See Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48, 104 L. Ed. 2d 29, 46 (1989). At the time DSS filed the juvenile petition on 8 November 2011, respondents were domiciled in Cherokee, North Carolina, within the Tribe's Qualla Boundary land trust.[4] Therefore, this case is governed by 25 U.S.C. § 1911, which grants exclusive jurisdiction to the tribal court, "except where such jurisdiction is otherwise vested in the State by existing Federal law." 25 U.S.C. § 1911(a).

Existing federal law provides three means by which a state court may exercise jurisdiction under subsection 25 U.S.C. § 1911(a). First, Public Law 280 provides six states — not including North Carolina — with jurisdiction over cases arising on "Indian country within the State." 28 U.S.C. § 1360(a) (2011). Second, a state court may exercise emergency jurisdiction under the ICWA over an Indian child who is temporarily located off of the reservation "in order to prevent imminent physical damage or harm to the child." 25 U.S.C. § 1922 (2012). Here, however, the district court did not purport to exercise emergency jurisdiction over Ellen, nor did it relinquish jurisdiction as contemplated by 25 U.S.C. § 1922. The record reflects that Ellen was safely in kinship care by agreement of respondents at the time DSS filed the juvenile petition. Finally, the ICWA authorizes *ad hoc* agreements between individual states and Indian tribes:

(a) . . . States and Indian tribes are authorized to enter into agreements with each other respecting care and custody of Indian children and jurisdiction over child custody proceedings, including agreements which may provide for orderly transfer of jurisdiction on a case-by-case basis

---

4. Pursuant to N.C. Gen. Stat. § 8C-1, Rule 201(c) (2011), we take judicial notice that the Town of Cherokee lies within the Qualla Boundary. *See State v. W.N.C. Pallet & Forest Products Co.*, 283 N.C. 705, 712, 198 S.E.2d 433, 437 (1973) (recognizing "courts will take judicial notice of . . . political subdivisions of the State"); *Wildcatt v. Smith*, 69 N.C. App. 1, 4, 316 S.E.2d 870, 873 (1984) (describing origin of the Qualla Boundary lands in western North Carolina).

and agreements which provide for concurrent jurisdiction between States and Indian tribes.

(b) . . . Such agreements may be revoked by either party upon one hundred and eighty days' written notice to the other party. . . .

25 U.S.C. 1919 (2012).

Respondents observe that the district court made no findings as to any agreement between the Tribe and the State affecting the tribal court's exclusive jurisdiction under 25 U.S.C. § 1919(a). Therefore, they contend, the court's orders in this cause are void.

Appellees guardian ad litem, DSS, and The Eastern Band of Cherokee Indians ask this Court to take judicial notice of a memorandum of agreement ("MOA") submitted by the guardian ad litem ("GAL") as a supplement to the record on appeal. See N.C.R. App. P. 9(b)(5) (2013). Styled "Agreement Between the Eastern Band of Cherokee Indians and the North Carolina Department of Health and Human Services, Division of Social Services; the Cherokee County Department of Social Services; the Graham County Department of Social Services; the Jackson County Department of Social Services; and the Swain County Department of Social Services[,]" the MOA purports "to establish, for the mutual benefit of the Parties, procedures which will provide for the enforcement of the [North Carolina's] Child Protective Services laws . . . consistent with the provision[s] of the Indian Child Welfare Act[.]" In pertinent part, the MOA provides that "[t]he TRIBE agrees to defer to the jurisdiction of the State of North Carolina for the specific purpose of complying with Chapter 7B of the North Carolina General Statutes" as authorized by 25 U.S.C. § 1919, and allows DSS to "file a Juvenile Petition in the District Court where the child resides pursuant to the provision of Chapter 7B" if DSS deems an Indian child "to be abused or at risk of being abused, neglected or dependent." The MOA was signed by the Tribe's principal chief on 8 December 2006, and by the directors of DSS and the state Division of Social Services on 16 March and 2 May 2007. In addition to providing for termination by the Tribe or State upon 180 days written notice, see 25 U.S.C. § 1919(b), the MOA allows for written modifications, if signed by all parties, and requires a joint review by the parties "no less than once every three (3) years."

Under North Carolina Rules of Evidence, Rule 201, a court may take judicial notice of adjudicative facts that are "not subject to reasonable dispute in that [they are] either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned." N.C.G.S. § 8C-1, Rule 201(b) (2011). "Judicial notice may be taken at any stage of the proceeding." *Id.* § 8C-1, Rule 201(f) (2011). Moreover, where a party makes a request and provides the court with the necessary information, judicial notice is mandatory. *Id.* § 8C-1, Rule 201(d) (2011).

Based on the materials before this Court, we are unable to take judicial notice of the MOA. As an evidentiary matter, the document tendered by the GAL is not certified or otherwise authenticated in accordance with our Rules of Evidence. N.C. Gen. Stat. §§ 8C-1, Art. 9 (2011). The GAL provides no source for the MOA; and the record provides no means for this Court to determine its formal validity. *Cf. Pallet*, 283 N.C. at 712, 198 S.E.2d at 437 ("Judicial notice is not taken of municipal ordinances, and annoying difficulties of proof may be encountered unless the ordinance is printed or published under proper authority.") (citation and quotations omitted); *cf. also Glenn-Robinson v. Acker*, 140 N.C. App. 606, 633—34, 538 S.E.2d 601, 620 (2000) (declining judicial notice of police department regulations). Nor are we persuaded that an MOA executed under 25 U.S.C. § 1919(a) falls within the ambit of "adjudicative facts" as contemplated by N.C.G.S. § 8C-1, Rule 201 (2011).[5] We are unable to determine, for example, whether such an agreement has been subject to an intervening modification by the parties or a revocation by the Tribe or the State as contemplated by 25 U.S.C. § 1919(b). We therefore conclude that the existence of the agreement between the Tribe and the State under the ICWA is in the nature of a "legislative fact" not subject to judicial notice. *See Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 38, 568 S.E.2d 893, 903 (2002) ("Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process . . . . Legal conclusions are not the proper subject of judicial notice." (citations and quotation omitted)).

Both DSS and the Tribe insist that the MOA's existence is "generally known within the territorial jurisdiction of the trial court[,]" N.C.G.S. § 8C-1, Rule 201(b) (2011), as evidenced by the fact that "four of the seven county departments of social services in the 30th Judicial District

---

5. Adjudicative facts "are the facts that normally go to the jury in a jury case" and involve "the immediate parties — who did what, where, when, how, and with what motive or intent[.]" N.C.G.S. § 8C-1, Rule 201, commentary (quotation omitted). "Legislative facts, on the other hand, are those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." *Id.*

of North Carolina are signatories" thereto. The GAL suggests that the district court took judicial notice of the MOA implicitly. As nothing in the trial court record makes reference to the MOA, however, we have no means by which to determine the state of general knowledge within Jackson County or the basis for the court's exercise of subject matter jurisdiction.

Because the question of the district court's jurisdiction under the ICWA cannot be resolved based on the evidence of record, we must remand the cause "for a determination of subject matter jurisdiction." *In re M.G.*, 187 N.C. App. 536, 538, 543, 653 S.E.2d 581, 585 (2007), *rev'd in non-pertinent part*, 363 N.C. 570, 681 S.E.2d 290 (2009); *see also In re A.R.*, __ N.C. App. __, __, 742 S.E.2d 629, 634 (2013) (remanding for findings on the applicability of the ICWA).

Notwithstanding our ruling, we proceed to address respondents' remaining arguments on appeal "in the interests of expediting review. In the event that the trial court concludes on remand that it lacks subject matter jurisdiction . . ., then it will be required to dismiss the petition[.]" *In re M.G.*, 187 N.C. App. at 548 n.5, 653 S.E.2d at 588 n.5.

## IV. Requirements for Foster Care Placement under the ICWA

[3] Respondent-mother next claims the trial court violated the ICWA by placing Ellen in DSS custody without clear and convincing evidence, including qualified expert testimony, that the child would likely suffer serious emotional or physical damage if she remained in the custody of respondent-mother. *See* 25 U.S.C. § 1912(e) (2012). While conceding that the district court made the necessary finding under 25 U.S.C. § 1912(e), she contends that the finding was not based on expert testimony adduced at the 7 January 2013 permanency planning hearing or otherwise supported by clear and convincing evidence at the hearing.

The relevant statute provides as follows:

> No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

*Id.* § 1912(e). As previously noted, the district court's transfer of legal custody from respondent-mother to DSS while leaving Ellen in kinship

care constituted a foster care placement subject to the requirements of 25 U.S.C. § 1912(e).[6] *See id.* § 1903(1)(i).

The record reflects that Jenny Bean, case manager for Cherokee Family Support Services, testified at Ellen's initial dispositional hearing on 4 April 2012 as an expert in "Indian Culture as it Applies to Indian Child Rearing[.]" In its May 2012 dispositional order, the district court made the following finding of fact by clear and convincing evidence: "In [Bean's] expert opinion, which the Court finds as fact, continued custody or a return to the custody of [respondent-father] and/or [respondent-mother] would likely cause serious physical or emotional damage to [Ellen]." Although Bean did not testify at any subsequent hearing, both the court's 15 November 2012 review order and its 18 February 2013 permanency planning order include the following finding:

> That Jenny Bean, case manager for Cherokee Family Support Services, *previously testified* and was received by the Court as an expert witness . . . . In her expert opinion, which the Court finds as fact, continued custody or a return of the custody of [respondent-father] and/or [respondent-mother] would likely cause serious physical or emotion damage to [Ellen].

(emphasis added). The finding is identical to the initial finding at disposition, except for the court's reference to Bean's "previous" testimony.

## A.  Timing of Qualified Expert Testimony under 25 U.S.C. § 1912(e)

[3] In urging this Court to uphold the permanency planning order, appellees note that 25 U.S.C. § 1912(e) does not require that the expert testify contemporaneously to the court's decision to order a foster care placement, merely that such testimony be presented. Respondent-mother disagrees. We have found no case law from other jurisdictions interpreting this specific aspect of 25 U.S.C. § 1912(e), and the issue is one of first impression for our appellate courts.

---

6. We recognize that the court's 90-day review order of 15 November 2012 conditioned respondent-mother's legal custody upon Ellen's kinship placement with J.F. This condition did not eliminate respondent-mother's legal right to demand the child's return, albeit with likely consequences. We further note that respondent-mother had no ability to appeal the 15 November 2012 review order, inasmuch as it did not "chang[e] legal custody" of Ellen. N.C. Gen. Stat. § 7B-1001(a)(4) (2011). We thus conclude that the court's formal transfer of legal custody from respondent-mother to DSS on 18 February 2013 amounted to Ellen's "foster care placement" under 25 U.S.C. § 1903(1)(i).

The practical flaw in appellees' position is revealed by their characterization of respondent-mother's appeal as an impermissible collateral attack on the 10 May 2012 disposition order which contained the district court's first iteration of the contested finding. Indeed, appellees assert that "the doctrine of collateral estoppel prevents respondent[-]mother from attacking this finding of fact[,]" having failed to appeal the original disposition order. We find this argument unpersuasive. Respondent-mother had no occasion to appeal from the initial disposition order in ·this cause, inasmuch as it awarded her both legal custody and physical care of her daughter. Indeed, as she observes, appellees' argument highlights the inherent conflict between the court's disposition and its finding — purportedly based on expert testimony and clear and convincing evidence — that continuing Ellen in respondent-mother's custody "would likely cause serious physical or emotional damage" to the child. *Cf. In re I.K.*, __ N.C. App. __, __, 742 S.E.2d 588, 593 (2013) (noting the inconsistency between the finding of a "reasonable probability" that respondent-father would discipline his daughter with a bullwhip and the court's award of unsupervised visitation to the father). The fact that the court waited until February of 2013 to remove Ellen from respondent-mother's custody, despite reiterating its finding of a likelihood of serious damage to the child in its November 2012 review order, "seems irrational" and calls into question the solemnity of the court's fact-finding. *Id.*

Notwithstanding Congress's avowed goal of preserving Indian families, we do not believe the ICWA contemplates a court leaving an Indian child in a parent's custody after finding a likelihood of serious physical or emotional damage to the child under 25 U.S.C. § 1912(e). Such an outcome would be contrary to the overriding concern on the child's best interests that lies at the heart of both the ICWA and our state's Juvenile Code. *See Adoptive Couple*, __ U.S. at __, 186 L. Ed. 2d at 740 ("[T]he purpose of [the ICWA] is *to protect the best interests of Indian children* and to promote the stability and security of Indian tribes and families[.]") (emphasis added) (citation and quotations omitted); *In re M.I.W.*, 365 N.C. 374, 381, 722 S.E.2d 469, 474 (2012) (recognizing "the fundamental principle underlying North Carolina's approach to controversies involving child neglect and custody[—]that the best interest of the child is the polar star" (alteration in original; citation and quotations omitted)). In other words, a determination under 25 U.S.C. § 1912(e) that "continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" should result in the child's removal from custody at the time such determination is made, not nine months and multiple hearings thereafter. While we need

not consider whether a 25 U.S.C. § 1912(e) determination *requires* the court to order a foster care placement, we are persuaded that Congress intended the determination to be made contemporaneously to any such placement. Our conclusion is fully consistent with the ICWA's purpose as well as the principle that "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit[.]" *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 85 L. Ed. 2d 753, 759 (1985). We therefore hold that a determination under 25 U.S.C. § 1912(e) must be supported by evidence, including expert testimony, introduced at the proceeding that results in the foster care placement.

## B. "Qualified Expert Witnesses" under the ICWA

[4] Although the ICWA does not define "qualified expert witnesses," non-binding guidelines promulgated by the Bureau of Indian Affairs emphasize "that Congress attribute[d] many unwarranted removals of Indian children to cultural bias on the part of the courts and social workers making the decisions." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593, (Nov. 26, 1979). Therefore, the guidelines offer the following list of "[p]ersons . . . most likely to meet the requirements for a qualified expert witness for purposes of Indian child custody proceedings:"

> (i) A member of the Indian child's tribe who is recognized by the tribal community as knowledgeable in tribal customs as they pertain to family organization and childrearing practices.

> (ii) A lay expert witness having substantial experience in the delivery of child and family services to Indians, and extensive knowledge of prevailing social and cultural standards and childrearing practices within the Indian child's tribe.

> (iii) A professional person having substantial education and experience in the area of his or her specialty.

*Id.* (stating the ICWA "makes clear that knowledge of tribal culture and childrearing practices will frequently be very valuable to the court").

We note that pediatric psychologist Dr. Lydia Aydlett testified as an expert at the 7 January 2013 permanency planning hearing but offered no opinion regarding the likelihood of serious physical or emotional damage to Ellen in respondent-mother's custody. Nor did the court purport to rely upon her opinion in making its determination under 25 U.S.C. § 1912(e), instead citing the previous testimony of Ms. Bean.

We further note that Dr. Aydlett did not profess any expertise in matters of Cherokee tribal culture or childrearing practices. While we need not define the specific requirements for a qualified expert witness under the ICWA, we do not believe Dr. Aydlett's hearing testimony or the few findings based thereon were sufficient to comply with 25 U.S.C. § 1912(e).

## C. Conclusion

In order to sustain a foster care placement under the ICWA, the "determination . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child" must be "supported by clear and convincing evidence, including testimony of qualified expert witnesses," adduced *at the proceeding* that results in the "placement . . . be[ing] ordered[.]" 25 U.S.C. § 1912(e). Because the qualified expert cited by the district court did not testify at the permanency planning hearing, its order awarding legal custody to DSS must be vacated and the cause remanded for further proceedings consistent with the ICWA.

## V. Ceasing Reunification Efforts as to Respondent-Father

**[5]** Respondent-father challenges the district court's ceasing of reunification efforts pursuant to N.C. Gen. Stat. § 7B-507(b)(1) (2011). Generally, "[a] trial court may cease reunification efforts upon making a finding that further efforts 'would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time[.]' " *In re C.M.*, 183 N.C. App. 207, 214, 644 S.E.2d 588, 594 (2007) (quoting N.C.G.S. § 7B-507(b)(1)). The order includes a conclusion of law that DSS "shall be relieved of the requirement that it make reasonable efforts to reunify [Ellen] with the Respondent Father as those efforts would be futile or inconsistent with [her] need for a safe, permanent home within a reasonable period of time." However, respondent-father claims that the ICWA overrides N.C.G.S. § 7B-507(b)(1). In the alternative, he contends the court's decision to cease reunification efforts under subpart (b)(1) was unsupported by its findings or the evidence.

Citing *In re D.K.H.*, 184 N.C. App. 289, 645 S.E.2d 888 (2007), appellees respond that respondent-father has no right of immediate appeal from the order ceasing reunification efforts under N.C.G.S. § 7B-1001(a) (5). *Id.* at 291, 645 S.E.2d at 890. Unlike the order at issue in *In re D.K.H.*, the 18 February 2013 permanency planning order also "change[d] legal custody of" Ellen from respondent-mother to DSS. N.C.G.S. § 7B-1001(a) (4). The order is thus immediately appealable pursuant to N.C.G.S. § 7B-1001(a)(4) and properly before this Court for review.

IN RE E.G.M.

[230 N.C. App. 196 (2013)]

## A. **Ceasing Reunification Efforts under the ICWA**

**[6]** Raising an issue of first impression in this Court, respondent-father argues the ICWA prohibits the ceasing of "active efforts"[7] to reunify an Indian family at any time prior to a termination of parental rights. 25 U.S.C. § 1912(d) (2012). He notes the ICWA makes no provision for ceasing such efforts toward the Indian family and cites the following statutory language as evincing its contrary intention:

> Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

*Id.* By requiring a finding of unsuccessful efforts both prior to placing a child in foster care and prior to termination of parental rights, respondent-father claims, the ICWA "does not allow the agency to give up on reuniting an Indian family until it has reached the final stage of the court proceedings" – resulting in either a termination of parental rights or the return of the child to the parents. Moreover, because the ICWA establishes "minimum Federal standards" for the protection of Indian families, *id.* § 1902, it prevails over any conflicting state law providing lesser protections.

By requiring "reasonable efforts" toward reunification, the North Carolina Juvenile Code incorporates the standard established by the Adoption and Safe Families Act ("ASFA") as a condition of federal funding under Title IV-E. 42 U.S.C. § 671(a)(15)(A) (2011); N.C. Gen. Stat. § 7B-100(5) (2011); *see also* 45 C.F.R. § 1356.21(b) (2012) ("The title IV-E agency must make reasonable efforts . . . to effect the safe reunification of the child and family[.]"); N.C. Gen. Stat. § 7B-101(18) (2011) (defining "reasonable efforts"). The ASFA specifies that "the child's health and safety shall be the paramount concern" when applying the term "reasonable efforts" in a given case. 42 U.S.C. § 671(a)(15)(A). The ASFA further enumerates four circumstances in which reasonable efforts are not required: (1) when "the parent has subjected the child to aggravated

---

7. Most states addressing the issue have held that the ICWA's "active efforts requirement 'sets a higher standard for social services departments than the reasonable efforts required by state statutes.'" *People ex rel. P.S.E.*, 2012 SD 49, ¶ 18, 816 N.W.2d 110, 115 (quotation omitted). However, respondent father disavows any objection to the quality of DSS's previous reunification efforts. We note the court did find that DSS had engaged in "active efforts to rehabilitate the Indian Family."

circumstances" such as torture; (2) when the parent has been convicted of murder or voluntary manslaughter of a parent or sibling of the child, or of a felonious assault that resulted in serious bodily injury to any of the parent's children; (3) when the parent's rights as to a sibling of the child have been involuntarily terminated; and (4) when such efforts are "determined to be inconsistent with the permanency plan for the child[.]" 42 U.S.C. § 671(a)(15)(C)-(D); 45 C.F.R. § 1356.21(b)(3). These circumstances are reflected in our courts' authority to cease reunification efforts under N.C.G.S. § 7B-507(b)(1)-(4).

Whether the ICWA forbids the ceasing of reunification efforts in circumstances where it is otherwise allowed by the ASFA is a matter of dispute among the states. *Compare J.S. v. State*, 50 P.3d 388, 392 (Alaska 2002) (relying on the ASFA as support for its ruling that active efforts were not required under the ICWA in cases of sexual abuse by a parent), *with In re J.S.B.*, 2005 SD 3, ¶ 21, 691 N.W.2d 611, 619 ("[W]e do not think Congress intended that ASFA's 'aggravated circumstances' should undo the State's burden of providing 'active efforts' under [the] ICWA."). A consensus has emerged, however, that "[a]lthough the state must make 'active efforts' under the ICWA, it need not 'persist with futile efforts.' " *In re K.D.*, 155 P.3d 634, 637 (Colo. App. 2007) (quoting *In re J.S.B.*, 2005 SD 3, ¶ 29, 691 N.W.2d at 621); *accord State ex rel. C.D.*, 2008 UT App 477, ¶ 30, 200 P.3d 194, 205 ("[T]he State must demonstrate that active efforts have been made with respect to the specific parent or Indian custodian . . . or provide evidence that such efforts would be futile."); *Letitia v. Superior Court of Orange Cnty.*, 97 Cal. Rptr. 2d 303, 308-09 (Cal. Ct. App. 2000) ("The law does not require the performance of idle acts."); *In re S.D.*, 599 N.W.2d 772, 775 n.3 (Mich. Ct. App. 1999) ("[U]nder the circumstances of this case, . . . remedial efforts would have been largely futile.").

We join our sister states in concluding that the court may order the cessation of reunification efforts in ICWA cases if it finds that "[s]uch efforts clearly would be futile." N.C.G.S. § 7B-507(b)(1). Moreover, we do not believe the ICWA requires reunification efforts to persist if they are "clearly . . . inconsistent with the juvenile's health, safety, and need for a safe, permanent home within a reasonable period of time." *Id.* As previously noted, the ICWA shares the primary aim of the ASFA and our Juvenile Code to protect and serve the best interests of children. *See Adoptive Couple*, ___U.S. at ___, 186 L. Ed. 2d at 740. As shown by the ASFA's imposition of strict deadlines to attain permanency for children in foster care, 42 U.S.C. § 675(5)(C), (E) (2011), both timeliness and permanency are essential to a child's well-being. *See In re T.H.T.*, 362 N.C. 446, 450,

IN RE E.G.M.

[230 N.C. App. 196 (2013)]

665 S.E.2d 54, 57 (2008) ("The importance of timely resolution of cases involving the welfare of children cannot be overstated."); *In re Fletcher*, 148 N.C. App. 228, 238, 558 S.E.2d 498, 504 (2002) (recognizing "the need for permanency for young children") (citation and quotation omitted).

We are not convinced by respondent-father's structural argument that the language of 25 U.S.C. § 1912(d) prohibits the ceasing of reunification efforts prior to the proceeding to terminate parental rights. This subsection merely requires a finding, both before ordering a foster care placement and before terminating parental rights, that "active efforts" to prevent the disruption of the Indian family "proved unsuccessful." If a court ceases such efforts at the time of the foster care placement, and the case then proceeds to termination, the court may simply cite the pre-foster-care efforts in making the necessary finding under 25 U.S.C. § 1912(d).

We hold that the authority of North Carolina's district courts to cease reunification efforts under N.C.G.S. § 7B-507(b)(1) does not conflict with "minimum Federal standards" for Indian child welfare cases established by the ICWA. 25 U.S.C. § 1902 (2012). The policy concerns that animate the ICWA do not oblige our social service agencies to undertake actions inconsistent with the welfare of Indian children. We recognize that the ICWA's application to a case will require "active efforts" toward reunification, rather than the "reasonable efforts" generally required by our Juvenile Code. It may also inform a court's assessment of what constitutes "a reasonable period of time" for purposes of N.C.G.S. § 7B-507(b)(1), if warranted by tribal culture or childrearing practices. As neither of these issues are raised by respondent-father's appeal, we need not address them.

## B. Sufficiency of Findings

[7] Respondent-father also claims that "the court made no specific findings regarding why continued reasonable efforts (or active efforts) were futile." We agree.

Despite its statutory designation as a finding or "ultimate finding[,]" *see In re I.R.C.*, ___ N.C. App. ___, ___, 714 S.E.2d 495, 499 (2011), the determination that grounds exist to cease reunification efforts under N.C.G.S. § 7B-507(b)(1) is in the nature of a conclusion of law that must be supported by adequate findings of fact. *See In re I.K.*, ___ N.C. App. ___, ___, 742 S.E.2d 588, 595 (2013) ("[T]he findings fail to support a conclusion that reunification efforts 'clearly would be futile or would be inconsistent with the juvenile's health, safety, and need for a safe, permanent

IN RE E.G.M.

[230 N.C. App. 196 (2013)]

home within a reasonable period of time.' ") (citing *In re T.R.M.*, 208 N.C. App. 160, 162, 702 S.E.2d 108, 109—10 (2010)).

Here, the court found that respondent-father was "currently in federal custody and unable to attend this hearing." After listing the conditions of his case plan, the court made the following additional findings about respondent-father:

> 16. . . . The Respondent Father has no visitation at this time.
>
> . . .
>
> 24. That on at least one occasion the Respondent Mother has spoken to the Respondent Father, despite the requirement that he have no contact with potential witnesses in his federal case. [He] reported to the Department's social worker that he had never gone to the Respondent Mother's apartment, but that the Respondent Mother was doing his wash for him and that he would see her from time to time away from her apartment.
>
> 25. That the Respondent Father's criminal attorney had filed a motion to allow the Respondent Father to have contact with the Respondent Mother because the Respondent Father did not think that [she] would be a witness. This was done because the [respondents] still have bills together. The Respondent Father has admitted to the social worker that he has spoken to the Respondent Mother by telephone . . . .

Plainly, these limited facts do not show that further efforts to reunify Ellen with her father "would be futile or inconsistent with [her] need for a safe, permanent home within a reasonable period of time." The specific factual findings in the order mostly address the actions and situation of respondent-mother. In addition, the order did not find any facts by reference to or incorporation by reference of any of the reports submitted to the trial court or prior orders, although the order does note that various exhibits and reports were "admitted into evidence." From these reports and prior orders, it appears that the trial court previously found in the disposition order that respondent-father "kicked [Nancy] down the stairs" and caused a serious and life-threatening injury to her small intestine, for which she had surgery and "was on a ventilator for approximately one week and in the Pediatric Intensive Care Unit (PICU) for 17 days." Respondent-father is under federal indictment for various

**IN RE E.G.M.**

[230 N.C. App. 196 (2013)]

felony charges as a result of his abuse of Nancy. There is also evidence that Ellen saw respondent-father kick her half-sister down the stairs and that she was traumatized by this event. Therefore, while there may be evidence in the record to support a determination that further efforts would be futile, it is up to the trial court to make proper factual findings based on the record evidence.

Accordingly, we reverse the order ceasing reunification efforts "and remand for entry of an order containing proper findings and conclusions." *In re I.K.*, __ N.C. App. at __, 742 S.E.2d at 596. The court may receive additional evidence on this issue, within its sound discretion. *Id.*

## VI. Conclusion

The district court's permanency planning order is hereby vacated. We remand to the court for further proceedings to include entry of findings of fact and conclusions of law on the following issues: (1) whether the court has subject matter jurisdiction under the ICWA; and if so (2) whether clear and convincing evidence *at the hearing*, including testimony of qualified expert witnesses, shows that respondent-mother's continued custody is likely to result in serious emotional or physical damage to Ellen; and (3) whether reunification efforts should cease as to respondent-father.

Vacated and remanded.

Judges McGEE and STROUD concur.