An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-242

Filed 19 November 2025

Cabarrus County, Nos. 23JA000169-120, 23JA000170-120, 23JA000171-120

IN THE MATTER OF: M.A.C., M.D.C., I.A.J.

Appeal by respondent-mother and respondent-father from order entered 4 November 2024 by Judge Jeanie R. Houston in Cabarrus County District Court. Heard in the Court of Appeals 29 October 2025.

*Patricia M. Propheter for appellant-respondent-mother.*

*Parent Defender Wendy C. Sotolongo, by Senior Assistant Parent Defender J. Lee Gilliam, for appellant-respondent-father.*

*Hartsell & Williams, PA, by Kimberly B. Kisner for Cabarrus County Department of Social Services*

*Administrative Office of the Courts, by GAL Staff Attorney Brittany T. McKinney, for Guardian ad Litem.*

ARROWOOD, Judge.

Respondent-mother ("Mother") and respondent-father ("Father") appeal from the trial court's order adjudicating minor child Iris an abused and neglected juvenile

and minor children Mike and Mark neglected juveniles.[1]  For the following reasons, we affirm.

## I.    Background

Mother and Father are the parents of Mark and Mike, born in 2018 and 2019 respectively.  Iris, born in 2014, is the daughter of Mother and Mr. J.[2]  Mother was previously granted physical custody of Iris and so all three children lived in the home with Mother and Father.

The Cabarrus County Department of Social Services ("CCDSS") became involved in 2016 when Mother reported that Mr. J was sexually abusing Iris.  In later years, Mother made four additional reports and by 2024, CCDSS had received a total of eight reports of sexual abuse of Iris.[3]  Only one of the reports, made in 2018, was substantiated by CCDSS.  According to CCDSS, they substantiated the report to err "on the side of caution to put services in place" for the family and to refer them to in-home services.  Mr. J was referred to and completed a sex offenders assessment with no recommendations, in addition to completing a substance abuse assessment with no recommendations and engaging in therapy sessions.

Many of the reports arose from leading conversations between Mother and Iris,

---

[1] Pseudonyms are used to protect the identities of the minor children.

[2] Iris' father did not appeal the trial court's order.  We abbreviate his name to protect the identities of the minor children.

[3] Seven of the reports alleged sexual abuse by Mr. J and one alleged sexual abuse by Iris' paternal grandmother.

"or behaviors displayed by [Iris] that [Mother] sexualized." For example, in 2018, when Iris was four, Mother reported that Iris' clitoris was red and puffy following visits with Mr. J. In another report, Mother stated that Iris was filling out more, her butt was getting bigger, and Iris would sometimes have her hands in her pants. Mother attributed those changes and behaviors to sexual abuse by Mr. J. Iris also repeated some of the allegations to CCDSS and medical personnel, telling them that Mr. J would touch her butt and penetrate her. Iris later recanted the accusations and did not disclose any sexual abuse in her therapy sessions.

As a result of the sexual abuse reports, Iris underwent several Sexual Assault Nurse Examiner ("SANE") and physical exams. Since 2015, at least nine exams were conducted on Iris, and four of them were conducted within 30 days of each other in 2018. Generally, the exams included anogenital exams which require the patient to sit in several different positions while the examiner looks for signs of abuse around the genitals and anus. Many of the exams also included SANE kits which collect DNA samples from the hair root and vaginal and anal swabs. Overall, the exams are invasive and can take a couple of hours to complete. None of the exams resulted in a substantiation or physical finding of abuse.

Iris' last known exam was conducted on 23 November 2022 at the Jeff Gordon's Children's Hospital Child Advocacy Center ("CAC"). It was her fourth exam at CAC since 2018. Out of concern for the number of exams Iris had gone through, the CAC recommended a Child Family Evaluation ("CFE").

On 5 December 2022, CCDSS conducted a follow up visit at the family residence. During the visit, Mother reported that Iris' paternal grandmother had visited Iris at school and Iris had not been the same since. Iris recanted her allegations that she had been sexually abused but then told Father that her grandmother had told her to lie and say the allegations were false. Mother did not believe Iris' recantation and attempted to pressure her to stick with her original allegations. When CCDSS attempted to meet with Mother about the upcoming CFE, Mother was apparently "more focused on Mr. [J] and his family seeing Iris than getting information about the CFE." Mother requested that CCDSS tell Iris' school that her father and grandmother could not visit, and CCDSS declined.

The CFE was scheduled for 20 December 2022. That day, Mother attempted to reschedule the CFE, claiming that the children were at the grocery store, the children were delivering packages with Father, and then that she had overslept and missed a school meeting for one of her other children. The CFE was not rescheduled and the children arrived an hour late, disheveled, and still in their pajamas with Mike and Mark not wearing shoes.

During the CFE, Iris reported that Mother had told her the meeting would be to talk about Mr. J and that Iris needed to "say the details and make sure it was specific details." Iris also reported that she wished her parents got along and knew she needed to be on Mother's side. Meanwhile, Mark reported that he was scared because Mother told him what to say and would be mad if he did not comply. Mark

also told the examiners that Mother and Father fought, sometimes with their hands, which he called "tagging." Similarly, Mike reported that Mother told him to say something to the examiner but he could not remember what, and that Mother and Father fought a lot at home. When discussing his parents' fights, Mike became visibly upset, cried, and crawled into the examiner's lap.

After the CFE, CCDSS concluded that Iris was emotionally abused by the severity and duration of her parents' conflict. Additionally, the CFE raised concerns that Mother was coaching Iris into making allegations of sexual abuse. They found that for the majority of Iris' life, there has been a "hyperfocus on sexually related behaviors or possible indications of abuse without an independent recollection of being sexually abused and [a] lack of evidence to validate the sexual abuse." Throughout the investigation, Iris would recant her allegations of abuse but Mother never believed her and would ask questions and make pointed remarks until Iris would admit to Mr. J abusing her. Additionally, Iris developed misguided beliefs that she had to support Mother in her allegations or else Mother would be sent to jail.

The CFE also concluded that all three children had been neglected based on factors of creating an environment that was injurious to the children's wellbeing and placing them at a significant risk of harm. Concern for Mike and Mark arose from their reports that Mother had told them what to say and would be mad at them if they did not do so. Additionally, from their comments about their parents fighting, CCDSS was concerned about Mother and Father's relationship and the effect of their

conflict on all three children in the home.

On 28 July 2023, CCDSS held a virtual meeting with Mother to go over the findings and recommendations of the CFE and CPS investigation. Mother refused to accept the findings, stating that she knew Mr. J sexually abused Iris. She then logged off the meeting and refused to log back on. When CCDSS came to the family's house to discuss the findings, Mother refused to let them in. Mother and Father also refused to develop or review CCDSS' case plan. CCDSS attempted to meet with Mother and Father to identify appropriate services at least twenty times. Mother and Father told CCDSS that they would not engage in case planning until the adjudication. Despite this, CCDSS continued to make referrals and connect Mother and Father with various services.

On 7 August 2023, CCDSS filed an abuse and neglect petition for Iris and a neglect petition for Mark and Mike. CCDSS took the children into nonsecure custody and all three were given a temporary placement. Iris was placed with her father and Mike and Mark were placed with their godmother. Mother and Father were granted visitation.

During visits with the children in November 2023, Mother discussed their native ancestry with them. In February 2024, CCDSS confirmed that Mother is a member of the Choctaw Nation of Oklahoma ("Choctaw Nation") and all three children are eligible for enrollment as members. In an effort to comply with the Indian Child Welfare Act ("ICWA"), CCDSS began engaging the Choctaw Nation by

inviting them to family meetings and permanency planning reviews, including them on all related email correspondence, and requesting culturally relevant materials to provide to the children's caretakers.

The trial court held an adjudication hearing on 8 May 2024 and a disposition hearing on 8 July 2024. At the adjudication hearing, Ms. Stacey Craven-Gatling, a licensed clinical social worker, testified that based on the facts in the matter and the tests administered, it was "highly probable that the children had been neglected based on factors of creating an environment that was injurious to the children's [welfare] and placed them at significant risk of harm." Another licensed clinical social worker, Ms. Jessica Hubbard, echoed the finding of neglect in her testimony. Additionally, she recounted the CFE interview where Mark cried and crawled into her lap, which she described as "extremely unusual." Both Ms. Craven-Gatling and Ms. Hubbard were tendered as expert witnesses.

Ms. Hailie Ridley, an ICWA specialist for the Choctaw Nation, presented testimony at the disposition hearing. She testified that "[t]he Tribe [was] not in agreement that active efforts [had] been made[]" to prevent the break-up of the family. She also stated that, based on the information provided to her, she could not provide testimony that returning the children to Mother and Father's custody would result in serious emotional damage. Additionally, she said that none of the allegations in the case appeared to reflect any cultural bias against "Indians in general [or] the Choctaw Nation[.]"

On 4 November 2024, the trial court entered its order adjudicating Iris an abused and neglected juvenile, and Mike and Mark neglected juveniles. The order also found that CCDSS complied with ICWA's requirement that they make active efforts to prevent the break-up of the family. Additionally, the court determined that "[a] return of custody of the juveniles to their parents would likely result in serious emotional and physical harm to the juveniles."

The certificate of service for the trial court's order is undated, and there is no other indication in the record of when the parties were served. On 7 November 2024, Father submitted a notice of appeal to the Cabarrus County Clerk's Office and served the notice on the other parties. According to an affidavit from Father's trial attorney, on 8 November 2024, the clerk's office requested that Father's notice of appeal be filed in Rowan County. Then on 12 November 2024, the Cabarrus County Clerk's Office rejected Father's notice of appeal, but his attorney did not see the email informing them of the rejection. On 12 December 2024, the Office of the Appellate Defender informed Father's trial attorney that the filing had been rejected because it needed to be filed in Rowan County. Father's trial attorney resubmitted the notice that same day and it was accepted. Meanwhile, Mother timely filed notice of appeal to this court on 3 December 2024.

## II. Discussion

Respondent-parents raise three issues on appeal: 1) whether the trial court complied with ICWA; 2) whether the trial court erred in adjudicating Iris abused and

neglected; and 3) whether the trial court erred in adjudicating Mike and Mark neglected. We first address Father's notice of appeal and petition for writ of certiorari.

A.     Respondent-Father's Notice of Appeal and Petition for Writ of Certiorari

Father argues that his notice of appeal was timely because there is no record of when the order was served on the parties, thereby tolling the timeline to file notice of appeal. Alternatively, Father has filed a petition for writ of certiorari.

Failure to timely appeal is a jurisdictional error that requires this Court to dismiss the appeal. *See Bradley v. Cumberland Cnty.*, 262 N.C. App. 376, 382 (2018). Parties have 30 days after entry and service of a disposition order to file a notice of appeal. N.C.G.S. § 7B-1001(b); *In re J.N.S.*, 207 N.C. App. 670, 677 (2010). Where service of the order occurred on a later day than entry of the order, the time period to appeal begins after service. *See In re I.T.P-L.*, 194 N.C. App. 453, 459 (2008). Here, had service of the order occurred on the day the order was entered, the window to appeal would have closed on 4 December 2024, making Father's appeal untimely. However, since the record does not show when service of the order occurred, we find that Father's timeline for filing a notice of appeal was tolled, and we assume jurisdiction to decide this appeal.

Out of an abundance of caution, we also issue writ of certiorari. Certiorari is a discretionary writ which may "be issued only for good or sufficient cause shown," and must "show merit or that [petitioner] has reasonable grounds for asking that the

case be brought up and reviewed on appeal." *In re Snelgrove*, 208 N.C. 670, 671–72 (1935) (citation omitted). Additionally, a writ of certiorari "should issue only if there are 'extraordinary circumstances' to justify it." *Cryan v. Nat'l Council of Young Men's Christian Ass'ns of U.S.*, 384 N.C. 569, 572 (2023) (quoting *Moore v. Moody*, 304 N.C. 719, 720 (1982)).

Notably, this court has issued writ of certiorari where "[r]espondents desired to pursue the appeal, understood the nature of the appeal, and cooperated with counsel in filing the notice of appeal . . . so as to avoid penalizing [r]espondents for their attorneys' errors." *In re I.T.P-L*, 194 N.C. App. at 460. Here, Father cooperated with his attorney to make timely appeal and believed he had succeeded in submitting notice of appeal. To not review his appeal would penalize him for an error solely belonging to his attorney. Furthermore, the parties in the case had notice of his appeal and will not be prejudiced by our reviewing it. Additionally, Father argues many of the same issues as Mother who timely appealed so it is in the interest of judicial economy to consider and resolve the issues presented here.

## B. ICWA

Father contends that the trial court erred by not complying with ICWA.[4] Specifically, Father argues that 1) there was insufficient evidence supporting the

---

[4] Father concedes that he does not have standing to challenge the court's findings about Iris. Mother does not raise any challenges under ICWA. Therefore, we only analyze the ICWA challenges in regard to Mike and Mark. The applicability of ICWA and its provisions concerning foster care placement are unchallenged.

trial court's determination that CCDSS made active efforts to prevent the breakup of the family, and 2) there was insufficient evidence to establish serious emotional or physical harm to Mark and Mike. We address each argument in turn.

### 1. Standard of Review

We review compliance with ICWA *de novo*. *See In re N.D.M.*, 288 N.C. App. 554, 557 (2023) (citing *In re A.P.*, 260 N.C. App. 540 (2018)). Under *de novo* review, this Court " 'considers the matter anew and freely substitutes its own judgment' for that of the lower court[]." *N.C. Farm Bureau Mutual Ins. Co., Inc. v. Herring*, 385 N.C. 419, 422 (2023) (quoting *In re Greens of Pine Glen Ltd. P'ship*, 356 N.C. 642, 647 (2003)).

### 2. Active Efforts to Prevent the Breakup of the Family

ICWA is a federal law enacted in 1978 to establish the "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." *In re A.P.*, 260 N.C. App. at 542 (quoting 25 U.S.C. § 1902 (2012)). Its purpose is to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families." *Id.* at 542–43 (quoting 25 U.S.C. § 1902). One requirement of ICWA is that "[a]ny party seeking to effect a foster care placement of . . . an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family . . . ." 25 U.S.C. § 1912(d) (2025).

ICWA does not define "active efforts." *See id.* However, the Bureau of Indian Affairs ("the Bureau") provides guidance which this Court has found instructive. *See* 25 C.F.R. § 23.2 (2025); *In re N.D.M.*, 288 N.C. App. at 559–60. The Bureau's rule states:

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe. Active efforts are to be tailored to the facts and circumstances of the case and may include, for example:
>
> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;
>
> …
>
> (5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by

the child's Tribe;
(6) Taking steps to keep siblings together whenever possible;
(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child[.]

25 C.F.R. § 23.2.

This Court analyzed ICWA's active efforts requirement in *In re N.D.M.* There, we found guidance from states that regularly address ICWA challenges such as Alaska, Montana, Oklahoma, South Dakota, and Washington. *In re N.D.M.*, 288 N.C. App. at 558. Our review of caselaw from those jurisdictions and the Bureau's recommendations revealed that "[t]he sufficiency of 'active efforts' will vary case-by-case and the final rule's definition of active efforts retains a state court's discretion to consider the facts and circumstances of each case." *Id.* at 560 (quoting *In re E.L.*, 61 Kan. App.2d 311 (2021)). Additionally, we distinguished between passive and active efforts. *Id.* at 561. Passive efforts include developing a case plan and expecting the parent to use their own resources to bring it to fruition, whereas active efforts entail taking the client through the steps of the plan. *Id.* (citing *Pravat P. v. Office of Children's Servs.*, 249 P.3d 264, 271 (Alaska 2011)).

However, "services and aid cannot be forced upon uncooperative, unwilling parents." *In re L.N.*, 970 N.W.2d 531, 541 (S.D. 2022). For example, in *In re L.N.*, the local DSS was assisting a family where the child had allegedly been neglected

and abused. *Id.* at 536. DSS offered the mother assistance in obtaining a counselor, but she refused and did not complete the recommended sessions. *Id.* at 537. Additionally, when DSS would attempt to review her case plan with her, the mother would become frustrated and request that they leave. *Id.* The mother also refused or failed to regularly attend chemical dependency group meetings, psychiatric appointments, and drug treatment programs. *Id.* at 538–539. The court found that though the efforts were unsuccessful due to the mother's unwillingness to participate, DSS had made active efforts by making referrals, scheduling appointments, providing transportation and funding and assisting the mother in obtaining medication. *Id.* at 542.

Here, CCDSS attempted to provide active efforts, but their efforts were undermined by the parent's insistence that they would not cooperate. Unchallenged findings of fact show that CCDSS performed a CFE and its stated goal throughout the process was reunification. Additionally, they invited the Choctaw Nation to be active participants in meetings and provide support to the family. Most importantly, CCDSS made a case plan, attempted to review the case plan with Mother and Father, and repeatedly made referrals and tried to connect them to various agencies to provide support in fulfilling the case plan. However, Mother and Father refused to meet with CCDSS and expressly stated that they would not cooperate with CCDSS. Given CCDSS' repeated efforts to support Mother and Father and the parents' unwillingness to cooperate with CCDSS, we find that the trial court did not err in

finding that CCDSS met ICWA's requirement of active efforts to provide services to the family.

3.     Sufficiency of Evidence of Serious Emotional or Physical Harm

Father contends that there was no evidence supporting the trial court's determination that returning Mike and Mark to their parent's custody would likely result in serious emotional or physical harm to the children. Father points to the testimony from Ms. Ridley, who he says is the sole qualified expert witness, that she did not perceive evidence that Mike and Mark were at risk of serious emotional or physical damage. Additionally, Father argues that the testimony from other expert witnesses do not support the determination of serious harm.

In contrast, CCDSS and GAL argue that the expert testimony does support the trial court's determination. Specifically, they claim that Ms. Craven-Gatling and Ms. Hubbard were the qualified expert witnesses under ICWA and their testimony shows a likelihood of serious harm. They point to Ms. Craven-Gatlin's testimony that it is "highly probable that the children had been neglected . . ." based on an injurious environment and the conflict between Mother and Father. They also highlight Ms. Hubbard's testimony about Mike being upset and crawling into her lap during an interview.

ICWA provides that

> [n]o foster care placement may be ordered . . . in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified

> expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(e).  Notably, part of the motivation behind ICWA's "qualified expert witness" requirement was concerns about the influence of cultural bias on the part of courts and social workers.  *In re E.G.M.*, 230 N.C. App. 196, 207 (2013).

ICWA does not define "qualified expert witness" ("QEW").  The Bureau's guidance states that a QEW "must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe."  25 C.F.R. § 23.122(a) (2025).  Courts have also found that testimony from expert witnesses without specific knowledge of the social and cultural standards of the child's Tribe can still be considered when determining whether continued custody is likely to result in serious emotional or physical damage to the child.  *See In re D.B.*, 414 P.3d 46, 50 (Colo. App. 2017); *Steven H. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 566, 571 (2008).

Here, ICWA's requirement that a qualified expert witness testify was met.  It is undisputed that Ms. Ridley had sufficient knowledge of the Choctaw Nation to testify about their social and cultural standards.  In fact, she specifically testified that none of the allegations in the case appeared to her to reflect any cultural bias against the Choctaw Nation.  She also testified as to the likelihood of serious emotional or

physical damage to the children if they were to return to their parent's custody. Ms. Craven-Gatling and Ms. Hubbard provided additional testimony regarding the welfare of the children that the trial court properly considered.

The expert testimony and the record provide clear and convincing evidence supporting the court's determination that the continued custody of Mike and Mark would likely result in serious emotional or physical damage to them. Both Ms. Craven-Gatling and Ms. Hubbard testified that Mother and Father had created a home environment that was injurious to the children's welfare and placed them at significant risk of harm. Such harm was further exhibited by Ms. Hubbard's testimony about Mike being upset and acting extremely unusual in their interview. Moreover, the parents' refusal to comply with CCDSS and lack of understanding of the harm done to the children indicate that the harm is likely to be repeated if the children are returned to their custody. Therefore, we affirm the trial court's determination that the continued custody of Mike and Mark would likely result in serious emotional or physical damage to them.

### C. Abuse and Neglect Adjudications

Mother argues that the trial court erred in adjudicating Iris an abused and neglected. Additionally, Mother and Father argue that the trial court erred in adjudicating Mike and Mark neglected. We address each argument in turn.

### 1. Standard of Review

In abuse and neglect cases, "we review a district 'court's adjudication to

determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law.' " *In re B.C.*, 298 N.C. App. 153, 158 (2025) (quoting *In re G.C.*, 384 N.C. 62, 65–66 (2023)). "Where no objection is made to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Id.* (quoting *In re G.C.*, 384 N.C. at 65–66). "We review the court's conclusions of law concerning adjudication de novo, that is, anew and without deference to the lower tribunal." *Id.*

## 2.    Iris

Mother contends that her repeated reports of sexual abuse, and subsequent exams of Iris, do not rise to the level of serious emotional damage required for a finding of abuse. Mother argues that she was protecting Iris from possible abuse and reporting her suspicions in accordance with state law. As to the adjudication of Iris as neglected, Mother argues that there was insufficient evidence to show that Iris suffered from physical, mental, or emotional impairment, as required by the courts.

### a.    Abuse

Pertinent to this case, an abused juvenile is one "whose parent . . . [c]reates or allows to be created serious emotional damage to the juvenile; serious emotional damage is evidenced by a juvenile's severe anxiety, depression, withdrawal, or aggressive behavior toward himself or others[.]" N.C.G.S. § 7B-101(1)(e) (2025). This Court has recognized that repeated allegations of sexual abuse leading to

unnecessary interviews and medical exams can be grounds for abuse. *See In re E.P.-L.M.*, 272 N.C. App. 585, 595–96 (2020); *In re B.C.*, 298 N.C. App. 153, 165–66 (2025). Additionally, the invasive nature of the resulting exams and interviews supports findings of "serious emotional damage." *In re E.P.-L.M.*, 272 N.C. App. at 595–96.

This Court recently addressed this issue in *In re B.C.* There, a mother had reported that her daughters had been physically and sexually abused by their father. *In re B.C.*, 298 N.C. App. at 155. Her concern arose after she discovered her daughters had been masturbating. *Id.* When interviewed, the daughters did not report any sexual abuse and the Child Protective Services (CPS) investigator determined that the mother's report was not credible. *Id.* at 156. The mother continued to claim that the daughters had been sexually abused and CPS became concerned she was coaching the children after hearing a discussion between the mother and her daughters. *Id.* The daughters were adjudicated abused and this Court affirmed. *Id.* at 158, 166. This Court found that by coaching her daughters and subjecting them to unnecessary evaluations, the mother had alienated the children from their father and caused significant emotional harm. *Id.* at 165–66.

Here, Mother's actions similarly subjected Iris to several invasive exams and sowed discord between Iris and Mr. J, preventing him from meeting Iris' medical and emotional needs. Mother argues that this case is distinct from *In re B.C.* because there the daughters consistently denied the abuse allegations whereas here Iris made the allegations herself to Mother, CCDSS, and evaluators at the CAC. However, the

trial court found that Mother coached Iris into making the allegations, and that finding is supported by clear and convincing evidence: none of the investigations or exams revealed any signs of abuse; Iris suggested in the CFE that Mother told her to tell specific details; Mother would question Iris until she admitted abuse; Iris believed Mother would go to jail if she denied the allegations; and Iris repeatedly recanted her allegations. Thus, the fact that Iris made some of the allegations herself does not make this case dissimilar to *In re B.C.*

The trial court's adjudication of abuse is supported by its findings that Mother coached Iris, repeatedly made unsubstantiated sexual abuse allegations that subjected to Iris' to invasive and harmful exams, and that Iris bore the brunt of the damaging impact of her parent's custody battle. Accordingly, we affirm the abuse adjudication.

b.    Neglect

A neglected juvenile is defined, in relevant part, as any juvenile whose parent "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." N.C.G.S § 7B-101(15)(e). "In order to adjudicate a juvenile neglected, our courts have additionally required that there be some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide proper care, supervision, or discipline." *In re L.C.*, 387 N.C. 475, 480 (2025) (quoting *In re Stumbo*, 357 N.C. 279, 283 (2003)). There need not be a specific written finding of a substantial risk of impairment, but

a trial court must make written findings of fact sufficient to support its conclusion of neglect. *Id.*

In *In re E.P.-L.M.*, this Court determined that a trial court's findings of fact were sufficient to support its neglect adjudication. *In re E.P.-L.M.*, 272 N.C. App. at 596. There, the trial court found: the respondent-mother made repeated, unsubstantiated allegations that her daughter was sexually abused; the mother continued to make such claims after determinations that the prior allegations were unsubstantiated; and as a result of the allegations the daughter was subjected to numerous harmful and invasive medical procedures. *Id.* This Court held that those findings established that the mother's improper care "exposed [the daughter] to harmful medical procedures, creating an environment injurious to [her] welfare" and were "sufficient to show the existence, or risk, of neglect." *Id.*

Here, the trial court similarly found that as a result of Mother's reports, Iris was subjected to invasive exams and that the frequency of the exams was concerning. It also found that Mother refused to believe that Iris had not been sexually abused. Further, Finding 19 stated that the custody battle between Mother and Mr. J was having a damaging effect on Iris. These findings demonstrate the existence and risk of neglect when Iris is in Mother's care. The trial court did not err in adjudicating Iris neglected.

### 3. Mike and Mark

Mother and Father contend that the trial court erred in adjudicating Mike and

Mark neglected. They argue that there are insufficient findings specifically about Mike and Mark and that the abuse and neglect of Iris is not sufficient to support an adjudication of Mike and Mark as neglected.

"In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home . . . where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home." N.C.G.S. § 7B-101(15). However, "[a]n adjudication of neglect cannot be 'solely based upon previous Department of Social Services involvement relating to other children.' Instead, the trial court must find 'the presence of other factors to suggest that the neglect or abuse will be repeated.'" *In re A.J.L.H.*, 384 N.C. 45, 55 (2023) (citation omitted) (quoting *In re J.A.M.*, 372 N.C. 1, 9–10 (2019)).

"When determining the weight to be given to a finding of abuse of another child in the home, a critical factor is whether the respondent indicates a willingness to 'remedy the injurious environment that existed' with respect to the older child." *Id.* at 56 (quoting *In re A.W.*, 377 N.C. 238, 249 (2021)). "Facts that can demonstrate a parent's unwillingness to remedy the injurious environment include failing to acknowledge the older child's abuse or insisting that the parent did nothing wrong when the facts show the parent is responsible for the abuse." *Id.*

In *In re A.J.L.H.*, our Supreme Court affirmed the adjudication of two younger siblings as neglected based on the parent's abuse of their oldest child. *Id.* The parents had imposed harsh physical punishments on the oldest child but not the

younger two. *Id.* However, the parents would not acknowledge the punishments as inappropriate and insisted they were necessary to discipline the oldest child. *Id.* The Court found that the parent's corresponding inability to commit to never repeating the abuse was a sufficient "other factor" to adjudicate the younger siblings as neglected. *Id.*

Here, the trial court properly adjudicated Iris as abused and neglected. Mike and Mark live in the same home and are thus subjected to the same "injurious environment." Mother and Father argue that the differences in age, gender, and relation with Mr. J, between Iris, Mike, and Mark diminish the risk of repeated abuse or neglect. While that may be true, Mother has failed to recognize the harm caused by her reports and the invasive medical procedures Iris endured. Additionally, Mother and Father refused to work with CCDSS in developing or following a case plan. Thus, Mother and Father demonstrated an unwillingness to "remedy the injurious environment that existed," which supports the adjudication of Mike and Mark as neglected.

Moreover, the court's adjudication of Mike and Mark as neglected was not solely based on the abuse and neglect of Iris. The trial court also found that there were concerns about the effect of the conflict between Mother and Father. The trial court's finding was supported by Mike and Mark's CFE interviews in which they both said that their parents fought. Additionally, expert testimony supported the trial court's conclusion that the home was an injurious environment detrimental to

Mike and Mark's well-being. Altogether, the court's findings of fact support the adjudication of Mike and Mark as neglected.

### III.  Conclusion

For the foregoing reasons, we affirm the trial court's order.

AFFIRMED.

Judges GORE and GRIFFIN concur.

Report per Rule 30(e).